ADVISORY OPINION *re* CONSTITUTIONALITY OF 1972 PA 294

OPINION OF THE COURT

1. COURTS—ADVISORY OPINION—SUPREME COURT—PRECEDENT.

An advisory opinion does not constitute a decision of the Michigan Supreme Court and is not precedentially binding in the same sense as a decision of that Court after a hearing on the merits.

2. CONSTITUTIONAL LAW—ADVISORY OPINION—SUPREME COURT.

The Michigan constitutional provision authorizing advisory opinions by the Supreme Court was not intended to encroach upon the right of the people to an adjudicative determination of their particularized claims of unconstitutionality (Const 1963, art 3, § 8).

3. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—TITLE OF ACT—CONSTITUTIONAL LAW.

No-fault automobile insurance act does not embrace more than one object and only one object is expressed in the title (Const 1963, art 4, § 24; 1972 PA 294).

4. INSURANCE—INSURANCE CODE—INSURANCE BUSINESS—SURETY BUSINESS.

The Insurance Code of 1956 intended to and did and does regu-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 27–30, 33–35, 58, 61] 16 Am Jur 2d, Constitutional Law § 111.

[3–85] See 7 Am Jur 2d, Automobile Insurance § 7.5 (Supp).

[4, 5, 42] 43 Am Jur 2d, Insurance §§ 51–89.

[6–8, 25] 50 Am Jur, Statutes §§ 72, 223.

[9–12, 21, 24] 50 Am Jur, Statutes §§ 259–265.

[13] 16 Am Jur 2d, Constitutional Law §§ 219, 239.

[17, 31, 77] 16 Am Jur 2d, Constitutional Law § 5.

[18, 45, 78, 82, 83] 50 Am Jur, Statutes §§ 204–216.

[38, 44] 50 Am Jur, Statutes § 177.

[39] 50 Am Jur, Statutes §§ 446, 447.

[46] 50 Am Jur, Statutes § 569.

[47, 48, 55, 56, 59, 63, 73, 76, 80, 81, 84] 50 Am Jur, Statutes §§ 561, 567, 576.

[50] 50 Am Jur, Statutes § 445 *et seq.*

[69, 72] 50 Am Jur, Statutes § 516.

late generally and broadly the insurance-surety business of Michigan (MCLA 500.100 *et seq.).*

5. INSURANCE—INSURANCE CODE—TITLE OF ACT—CONSTITUTIONAL LAW.

All possible presumptions should be afforded to find constitutionality and the amended title of the Insurance Code of 1956 should be construed reasonably, not narrowly and with unnecessary technicality (1972 PA 294).

6. STATUTES—CONSTITUTIONAL LAW—ONE-OBJECT LIMITATION—NOTICE.

An act may include all matters germane to its object and it may include all those provisions which directly relate to, carry out and implement the principal object; the purpose of the one-object limitation of the Michigan Constitution is to insure that both the legislators and the public have proper notice of legislative content and to prevent deceit and subterfuge (Const 1963, art 4, § 24).

7. STATUTES—CONSTITUTIONAL LAW—ONE-OBJECT LIMITATION—NOTICE.

The goal of the one-object limitation of the Michigan Constitution is notice, not restriction of legislation (Const 1963, art 4, § 24).

8. STATUTES.

Legislation, if it has a primary object, is not invalid because it embraces more than one means of attaining its primary object.

9. CONSTITUTIONAL LAW—CONSTRUCTION.

The first consideration given to determining the meaning of constitutional language simply should be to read it.

10. CONSTITUTIONAL LAW—STATUTES—AMENDMENTS—TITLE OF ACT.

The language of a section of an article of the Michigan Constitution is quite clear; it says succinctly and straightforwardly that no law (meaning statutory enactment) shall be revised, altered or amended by reference to its title only; the constitutional language then proceeds to state how it shall be done, *i.e.,* that the section or sections of the act in question shall be amended by reenacting and republishing at length (Const 1963, art 4, § 25).

11. CONSTITUTIONAL LAW—STATUTES—AMENDMENTS—TITLE OF ACT—LAW—ACT—WORDS AND PHRASES.

"Law" means act or section of an act, as used in a section of an article of the Michigan Constitution which provides in part

that "[n]o law shall be revised, altered or amended by reference to its title only" (Const 1963, art 4, § 25).

12. CONSTITUTIONAL LAW—CONSTRUCTION—PRECEDENT.

A second consideration in determining the meaning of constitutional language is the analysis of precedent; in pursuing precedent, those cases decided at a time proximate to the ratification of the constitution are important in that they better reflect the meaning of the language of the constitution at the time it was written.

13. CONSTITUTIONAL LAW—COURTS—LEGISLATURE—DISCRETION.

Constitutional division of powers mandates that the courts not interfere with legislative action by fabricating standards not constitutionally required; the Legislature must be allowed sufficient discretion at this point, provided that such discretion is exercised within constitutional limitations (Const 1963, art 3, § 2).

14. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—NOTICE—CONSTITUTIONAL LAW.

The language and content of a statute, providing for no-fault automobile insurance, is entirely sufficient to give the notice to the Legislature and the public of what is being changed and the content thereof as required by a section of an article of the Michigan Constitution (Const 1963, art 4, § 25; 1972 PA 294).

15. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—AMENDMENTS—TITLE OF ACT—CONSTITUTIONAL LAW.

Statute, providing for no-fault automobile insurance, does not violate standards set forth in the constitutional provision that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length"; it does not revise, alter or amend in such prohibited fashion (Const 1963, art 4, § 25; 1972 PA 294).

16. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—CONSTITUTIONAL LAW.

Act, providing for no-fault automobile insurance, details all that is required for institution of a "no-fault" system of motor vehicle insurance; it is an act complete within itself; it falls squarely within the rule that an act complete in itself is not within the mischief designed to be remedied by a constitutional provision that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at

length" and cannot be held to be prohibited by it without violating the plain intent (Const 1963, art 4, § 25; 1972 PA 294).

17. CONSTITUTIONAL LAW—SUPREME COURT.

The task of the Michigan Supreme Court is to apply the constitution as adopted by the people and it cannot and should not attempt to anticipate and resolve all imagined difficulties.

18. STATUTES—TITLE OF ACT—AMENDMENTS—CONSTITUTIONAL LAW.

Section of an article of the Michigan Constitution providing "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" is directed at preventing undesirable conduct with respect to amendment of a particular act; it does not seek to correct tangential effects which the amendment, revision or alteration may have on those statutes not directly affected (Const 1963, art 4, § 25).

19. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—AMENDMENTS.

There is no attempt to alter or amend by reference or by striking out or insertion of words without reproduction of the statute in its amended form in the no-fault automobile insurance act (1972 PA 294).

20. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—AMENDMENTS—INSURANCE CODE—TITLE OF ACT.

The so-called "No-Fault Insurance" amendment modifies the title of and adds a chapter to the Insurance Code; it is a complete act and does not confuse or mislead but publishes in one act for all the world to see what it purports to do (MCLA 500.100 *et seq.;* 1972 PA 294).

21. CONSTITUTIONAL LAW—CONSTRUCTION—SUPREME COURT.

Constitutional language must be given reasonable and practical interpretations and the Michigan Supreme Court must try not to extend and expand the wording out of its original context and meaning in order to respond to imagined or even real mischief.

22. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—INSURANCE CODE—AMENDMENTS—TITLE OF ACT.

No-fault automobile insurance act does not purport by its terms to revise, alter or amend any act or section of an act other than the Insurance Code; it does amend the title of the Insurance

Code *and* it sets forth in full the amendments to the body of the Code (MCLA 500.100 *et seq.;* 1972 PA 294).

23. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— TITLE OF ACT—AMENDMENTS—CONSTITUTIONAL LAW—NOTICE.

The notice requirement of a section of an article of the Michigan Constitution has been met, the enactment standards have been met and the act, providing for no-fault automobile insurance, is complete within itself and meets the test of constitutionality as applied by a section of an article of the Michigan Constitution which provides "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" (Const 1963, art 4, § 25; 1972 PA 294.).

24. WORDS AND PHRASES—SERIOUS IMPAIRMENT OF BODY FUNCTION— PERMANENT SERIOUS DISFIGUREMENT.

Phrases "serious impairment of body function" and "permanent serious disfigurement" are capable of legal interpretation and, indeed, juries or judges sitting without juries frequently have and do interpret comparable phrases bearing upon various facets of the law.

25. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.

Michigan Supreme Court, when construing a statute, must give effect to the legislative intent and read the language in the light of the general purpose sought to be accomplished (MCLA 8.3).

26. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— WORDS AND PHRASES—SERIOUS IMPAIRMENT OF BODY FUNCTION —PERMANENT SERIOUS DISFIGUREMENT—TORTS—TRIER OF FACT.

Phrases "serious impairment of body function" and "permanent serious disfigurement" as used in a section of the no-fault automobile insurance act are not less precise than that which has been adopted to express other standards for determining tort liability; they are within the province of the trier of fact and are sufficient for legal interpretation (MCLA 500.3135).

CONCURRING OPINION

T. G. KAVANAGH and LEVIN, JJ

27. CONSTITUTIONAL LAW—SUPREME COURT—ADVISORY OPINION— STATUTES—LEGISLATURE—GOVERNOR.

Michigan's Constitution restricts advisory opinions of the Supreme Court to important questions of "law", concerning the

"constitutionality" of legislation, "upon solemn occasions" when requested by either house of the Legislature or the Governor, and after the legislation has been enacted into law but before the effective date (Const 1963, art 3, § 8).

28. COURTS—ADVISORY OPINION—SUPREME COURT—QUESTIONS OF FACT—STATUTES—CONSTRUCTION.

The Michigan Supreme Court, in the context of an advisory opinion, may not examine questions of fact, and questions concerning the interpretation or construction of a statute may not be considered except as those questions affect a constitutional question.

29. COURTS—ADVISORY OPINION—CONSTITUTIONAL LAW—INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—DUE PROCESS—EQUAL PROTECTION—EVIDENCE—FACTUAL ISSUES.

Michigan Supreme Court could not prudently proceed on a request for an advisory opinion on the constitutionality of the no-fault automobile insurance act on the assumption that the specific constitutional issues adumbrated by the equal protection and due process questions could authoritatively be answered without hearing any evidence and without any findings on factual issues (1972 PA 294).

30. COURTS—ADVISORY OPINION—SUPREME COURT—PRECEDENT—STARE DECISIS—GOVERNOR—SENATE—CONSTITUTIONAL LAW.

An advisory opinion is not an adjudicative decision of the Michigan Supreme Court and is not binding in the same sense as a decision of the Court after a hearing on the merits constitutes a precedent under the doctrine of stare decisis; advisory opinions are read by the public, the profession, the Governor and the Senate as a definitive expression of the views of the Michigan Supreme Court and any such expression must be carefully circumscribed so as not to inhibit a seemingly different determination in a case where the contending parties have had an opportunity to present relevant facts, adjudicative as well as constitutional.

31. COURTS—STATUTES—CONSTITUTIONAL LAW.

A court, when it holds an act to be constitutional, does no more than deny a particular claim of unconstitutionality; it ought not, by premature expressions on generalized abstract claims, appear to foreclose persons differently situated from advancing more concrete claims of unconstitutionality.

32. COURTS—SUPREME    COURT—STATUTES—CLASSIFICATION—INSUR-
    ANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE.
    It is not properly within the Michigan Supreme Court's function
    to hypothesize particularized claims or to set up, speculatively,
    strawmen classes of persons who might claim to be disadvan-
    taged in various ways by the various classifications and provi-
    sions of the no-fault automobile insurance act (1972 PA 294).

33. CONSTITUTIONAL    LAW—ADVISORY    OPINION—SUPREME    COURT—
    MICHIGAN TRIAL LAWYERS ASSOCIATION—STATE BAR.
    The Michigan Supreme Court is not constitutionally authorized
    to furnish advisory opinions to the Michigan Trial Lawyers
    Association or a committee of the State Bar.

34. COURTS—ADVISORY  OPINION—SUPREME  COURT—EQUAL  PROTEC-
    TION—DUE PROCESS—CONSTITUTIONAL LAW—INSURANCE—AUTO-
    MOBILES—NO-FAULT AUTOMOBILE INSURANCE—GOVERNOR—SEN-
    ATE—FINDINGS OF FACT.
    The Michigan Supreme Court should decline to answer the equal
    protection and due process questions posed by the Governor
    and the Senate in their requests for an advisory opinion on the
    constitutionality of the no-fault automobile insurance act be-
    cause they failed to delineate particularized claims of unconsti-
    tutionality on behalf of persons generally or specific classes of
    persons, because it might be necessary to hear testimony,
    consider other evidence and make findings of fact in order to
    determine authoritatively the merits of some particularized
    claims of unconstitutionality, and because any expression sus-
    taining the constitutionality of the act, unless carefully circum-
    scribed, might prejudice a fair adjudication of a subsequent
    meritorious claim presented for the first time after an eviden-
    tiary hearing (1972 PA 294).

35. COURTS—ADVISORY    OPINION—GOVERNOR—SENATE—SUPREME
    COURT—CONSTITUTIONAL LAW—FACT FINDING.
    Questions to which the Michigan Supreme Court responds on
    request of the Governor and Senate satisfy the criteria for an
    advisory opinion in that they advance sufficiently particularized
    claims of unconstitutionality, adjudicative fact finding is not
    required and the scope of the Court's opinion should not be
    subject to misinterpretation and should not prejudice adjudica-
    tion of future actual cases.

36. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—
    INSURANCE CODE.
    *The no-fault motor vehicle liability act—enacted as a new and
    separate chapter of the Insurance Code—changes the present*

system of compensating victims of automobile accidents by requiring an owner of a motor vehicle to maintain "security" for the payment of no-fault and other benefits to himself and others, and by modifying the liability for negligent driving of a motor vehicle (1972 PA 294).

37. Insurance—Automobiles—No-Fault Automobile Insurance—Torts—Common Law—Death—Serious Disfigurement.

The no-fault automobile insurance act modifies tort liability by eliminating the common-law liability for negligent driving of an insured automobile in those cases where the injuries caused do not result in either death, in serious impairment of body function, or in permanent serious disfigurement; however, even if the injuries are not so serious, the negligent tortfeasor remains liable if the injured person's damages for allowable expenses, work loss and survivor's loss exceed the daily, monthly and three-year limitations contained in the act (1972 PA 294).

38. Statutes—Object.

The "object" of a statute is the general purpose or aim of the enactment.

39. Statutes—Codification—Constitutional Law—Legislature.

Codification of multifarious enactments would be impossible if the constitution obliges the Legislature to define the object of a codification in narrow terms; especially in the case of a codification, the Legislature is free to conceive of the object of its endeavors in terms of a common denominator and to express that conception in umbrella words.

40. Insurance—Automobiles—No-Fault Automobile Insurance—Insurance Code—Compulsory Insurance—Object of Act.

The object of the no-fault automobile insurance act is reform of the present system of compensating persons injured by automobiles; the generally stated object of the Insurance Code is the codification of the laws "relating to the insurance and surety business"; the compulsory insurance feature of the no-fault automobile insurance act is within the object of a code of laws relating to the insurance business (MCLA 500.100 et seq.; 1972 PA 294).

41. Insurance—Automobiles—No-Fault Automobile Insurance—Purpose.

The widely declared purpose of the no-fault automobile insurance act is to reduce the cost of automobile insurance and to in-

*crease the proportion of the premium dollar ultimately paid to injured persons (1972 PA 294).*

42. INSURANCE—LIABILITY INSURANCE—STATUTES.

*Legislation designed to increase the cost effectiveness of insurance by redefining the scope of the insured person's liability is germane to, and, therefore, within the object of an act relating to the insurance business.*

43. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—INSURANCE CODE—STATUTES.

*Redefining the risk insured is within the object of a codification of laws relating to the insurance business; the no-fault automobile insurance act is within the object of the Insurance Code as originally enacted (MCLA 500.100 et seq.; 1972 PA 294).*

44. WORDS AND PHRASES—OBJECT—ALTER—AMEND.

*Just as the word "object" is a protean word, so, too, are the words "alter" and "amend".*

45. STATUTES—AMENDMENTS.

*A change in statutory law can be viewed solely in terms of its direct consequences or in terms of its indirect, or even remote, consequences as well.*

46. ACTION—PROCEDURE.

*A change in the procedure for maintaining an action may alter the enforceability of rights established under other laws.*

47. STATUTES—REPEALS BY IMPLICATION—REENACTMENT—PUBLICATION.

*A later act can constitutionally alter or amend or repeal by "implication" the effect of an earlier act without express reference to the earlier act, reenactment and publication at length.*

48. STATUTES—INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—COMMON LAW—CIVIL LIABILITY ACT—WRONGFUL DEATH ACT.

*The principal change in former law wrought by the no-fault automobile insurance act is the modification of the common-law liability for negligence in driving an automobile; in consequence, there is a change in the recoveries allowable under the civil liability act and the wrongful death act (MCLA 257.401, 600.2922; 1972 PA 294).*

49. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—CIVIL LIABILITY ACT—WRONGFUL DEATH ACT.

*The no-fault automobile insurance act does not change the fea-*

tures of the earlier civil liability and wrongful death acts which makes them unique, the vicarious liability in the one case and the actionability of wrongful death and survival of actions in the other (MCLA 257.401, 600.2921, 600.2922; 1972 PA 294).

50. CONSTITUTIONAL LAW—STATUTES—REENACTMENT—PUBLICATION—COMMON LAW—AMENDMENTS.

The constitutional limitation requiring reenactment and publication at length restricts legislative alteration or amendment of earlier statutory law, not common law; a legislative modification of the common law can properly be enacted without reenactment and publication at length of provisions of earlier acts which assimilate or implement, but do not purport to state, the common law (Const 1963, art 4, § 25).

51. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—UNINSURED MOTOR VEHICLE.

Under the no-fault automobile insurance act it will no longer be lawful to operate an uninsured motor vehicle if it is required to be registered in the State of Michigan or if operated in this state for an aggregate of more than 30 days in any calendar year (1972 PA 294).

52. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—MOTOR VEHICLE ACCIDENT CLAIMS FUND.

Presumably, the intent of the Legislature is that the liability of the Motor Vehicle Accident Claims Fund to pay damages caused by uninsured motor vehicles will be taken over by the assigned claims facility provided for in the no-fault automobile insurance act as amended; the precise interplay of the earlier accident claims and the new no-fault acts is not stated; the public, Bench and Bar must fathom this for themselves (1972 PA 294, 345).

53. CONSTITUTIONAL LAW—REENACTMENT—PUBLICATION—INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—MOTOR VEHICLE ACCIDENT CLAIMS ACT.

To the extent, if at all, there has been a violation of the constitutional reenactment and publication requirement because of the failure to spell out the precise interplay between the earlier accident claims act and the no-fault automobile insurance act the remedy need not be a declaration of unconstitutionality; another remedy would be simply to declare that the liability of the accident claims fund continues (Const 1963, art 4, § 25; MCLA 257.1101; 1972 PA 294).

54. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—
LIMITATION OF ACTIONS

*The no-fault automobile insurance act requires, with certain exceptions, commencement of an action to recover no-fault insurance benefits within one year after the accident; there have been countless cases where a like exception to the general statute of limitations has been enforced (MCLA 500.2832; 1972 PA 294).*

55. STATUTES—AMENDMENT BY IMPLICATION—CONSTITUTIONAL LAW—
REENACTMENT—PUBLICATION.

*Generally, when a new act changes earlier acts by so-called implication, the new act fails to identify or reenact or publish at length affected sections of earlier acts; thus, even though a new act does not spell out the changes in earlier acts so that a reader of the new act or of an affected act will be readily aware of the changes, it does not follow that the constitutional limitation requiring reenactment and publication at length has been violated (Const 1963, art 4, § 25).*

56. CONSTITUTIONAL LAW—STATUTES—REENACTMENT—PUBLICATION.

*The meaning of the constitutional limitation requiring reenactment and publication at length as applied to a particular case becomes, in the last analysis, a matter of judgment, not subject to resolution by a talisman; the question becomes whether the challenged act is "within the mischief designed to be remedied" (Const 1963, art 4, § 25).*

57. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—
CONSTITUTIONAL LAW—STATUTES—REENACTMENT—PUBLICA-
TION.

*The no-fault automobile insurance act falls on the constitutional side of an obscure line between two Michigan cases construing the constitutional limitation requiring reenactment and publication at length of acts affected by a new act (Const 1963, art 4, § 25; 1972 PA 294).*

SEPARATE OPINION

T. M. KAVANAGH, C. J., and WILLIAMS, J.

58. COURTS—ADVISORY OPINION—SUPREME COURT—GOVERNOR—SEN-
ATE—CONSTITUTIONAL LAW.

*Questions raised in briefs and oral arguments which are not within the scope of the advisory opinions requested by the*

*Governor and the Senate may not properly be considered by the Michigan Supreme Court (Const 1963, art 3, § 8).*

59. CONSTITUTIONAL LAW—LEGISLATURE—SUPREME COURT—STATUTES —TORTS—COMMON LAW.

*The Legislature has power under a section of an article of the Michigan Constitution to originate or abolish statutory forms of tort liability as well as the power, concurrent with the inherent and express constitutional power of the Michigan Supreme Court to change common-law tort liability (Const 1963, art 3, § 7).*

60. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— TITLE OF ACT—CONSTITUTIONAL LAW—ONE-OBJECT LIMITATION.

*No-fault automobile insurance act does not embrace more than one object in violation of a section of an article of the Michigan Constitution providing "[n]o law shall embrace more than one object, which shall be expressed in its title" because of the presumption of constitutionality protecting an act of the Legislature, particularly where the constitutional provision involved admits of the remedy of severability and the phrases "serious impairment of body function" and "permanent serious disfigurement" as used in a section of that act are "sufficient for legal interpretation" (Const 1963, art 4, § 24; MCLA 500.3135; 1972 PA 294).*

61. COURTS—ADVISORY OPINION—CONSTITUTIONAL LAW—STATUTES— TITLE OF ACT—AMENDMENTS—REENACTMENT—PUBLICATION— AUTOMOBILES—INSURANCE—NO-FAULT AUTOMOBILE INSURANCE.

*An advisory opinion by a Justice of the Michigan Supreme Court finding that the procedures required by a section of an article of the Michigan Constitution that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" were not complied with in the enactment of the no-fault automobile insurance act, it is not a decision declaring that act unconstitutional; the act is not invalidated and continues to stand; those procedural requirements can be remedied, if the Legislature so wishes, without enacting the no-fault act again (Const 1963, art 4, § 25; 1972 PA 294).*

62. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— AMENDMENTS—CONSTITUTIONAL LAW.

*The no-fault automobile insurance act plainly is meant to "modify" existing law and when that act uses the term "to modify"*

*and what it does pursuant thereto is plainly what a section of an article of the Michigan Constitution is talking about when it refers to "revised, altered or amended" (Const 1963, art 4, § 25; 1972 PA 294).*

63. CONSTITUTIONAL LAW—STATUTES—AMENDMENTS—REENACTMENT —PUBLICATION.

*A section of an article of the Michigan Constitution plainly says the Legislature cannot "modify", or as stated in that Constitution, "revise, alter or amend" existing law without reenactment and republication (Const 1963, art 4, § 25).*

64. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— CONSTITUTIONAL LAW—STATUTES—TITLE OF ACT—AMENDMENTS —REENACTMENT—PUBLICATION.

*The no-fault automobile insurance act plainly was not enacted properly pursuant to the procedures required by a section of an article of the Michigan Constitution that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length", since the Legislature did not reenact and republish the sections or acts the no-fault act purports to amend and since the no-fault act purported to "revise, alter or amend" existing law (Const 1963, art 4, § 25; 1972 PA 294).*

65. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— TITLE OF ACT—CIVIL LIABILITY ACT—OWNERS LIABILITY— WRONGFUL DEATH ACT—AMENDMENTS—CONSTITUTIONAL LAW.

*The no-fault automobile insurance act modifies existing law because the title of that act in stating its purpose includes "to modify tort liability arising out of certain accidents"; a section of the act provides that notwithstanding any other provision of law, tort liability arising from the ownership, maintenance or use within this state of a motor vehicle is abolished except as to specified instances; that section does modify a section of the civil liability act providing that the owner of a motor vehicle shall be liable for injury occasioned by the negligent operation of such motor vehicle and equally purports to modify the wrongful death act by superseding it except where death is intentionally caused, where noneconomic losses are involved in a death and where a survivor's damages exceed those allowed under the no-fault act because "modify" is interchangeable with "alter" and "amend" and the phrase "to modify" as used in the title to the no-fault act is the same as the phrase "revised, altered or amended" in a section of an article of the*

*Michigan Constitution (Const 1963, art 4, § 25; MCLA 257.401, 500.3135, 600.2922; 1972 PA 294).*

66. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—
STATUTES—AMENDMENTS—OWNERS LIABILITY—COMMON LAW—
NEGLIGENCE ENTRUSTMENT.

*A section of the no-fault automobile insurance act purports to modify, alter or amend both common law and statutory law; vicarious owners liability, qua owner, is not derived from common law and is purely statutory in Michigan, governed by the so-called "owners liability act"; the liability of an owner for "negligent entrustment" is common law derived but is not based merely on his status as owner but rather upon his conduct in the entrusting; that section of the no-fault automobile insurance act does not purport to "modify" only common-law tort liability arising from "maintenance or use" but also refers to that tort liability arising purely from "ownership" and, since there is no common-law liability arising purely from ownership, it can only be the owners liability in the civil liability act that is being referred to because this later act is the only "provision of law" giving rise to tort liability for mere ownership (MCLA 257.401, 500.3135).*

67. AUTOMOBILES—OWNERS LIABILITY—OPERATORS LIABILITY—NEGLI-
GENCE—STATUTES—NEGLIGENCE PER SE—COMMON LAW—DUTY
OF CARE.

*It may not be said that the owners liability statute is conditioned exclusively upon only the common-law liability of the operator; the violation of statutes constitutes negligence per se so that the only question for the jury is whether there was causation, not whether there was negligence; the common-law duty of due care is independent of statutory duties and the rule of negligence per se (MCLA 257.401).*

68. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE—
REPEAL OF ACTS—WRONGFUL DEATH ACT—CIVIL LIABILITY ACT
—CONSTITUTIONAL LAW—REENACTMENT—PUBLICATION.

*The no-fault automobile insurance act does not meet the test that the act supersedes and repeals all other acts in relation thereto because the title of the act states that it is to modify tort liability rather than to supersede and repeal and there is no general repealer; the act attempts to preserve certain parts of prior acts or actions because sections thereof refer necessarily to the wrongful death and civil liability acts in case of damages for noneconomic loss where the injured person has suffered death; therefore, the act does not fall within the "act complete*

*in itself" exception under a section of an article of the Michigan Constitution requiring reenactment and republication (Const 1963, art 4, § 25; MCLA 257.401, 500.3135, 600.2922; 1972 PA 294).*

69. STATUTES—REPEAL.

*Even though two acts are not repugnant, yet if the later covers the whole subject of the first, and contains provisions showing that it was a substitute, it will operate as a repeal.*

70. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— CONSTITUTIONAL LAW—REENACTMENT—PUBLICATION.

*The no-fault automobile insurance act does not meet the test of not having to rely on a single provision of the former law because a section thereof specifically indicates that actions and remedies thereunder are not all inclusive but other law including statutes must be relied on; therefore, the act does not fall within the "act complete in itself" exception under a section of an article of the Michigan Constitution requiring reenactment and republication (Const 1963, art 4, § 25; 1972 PA 294).*

71. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— CIVIL LIABILITY ACT—CONSTITUTIONAL LAW—REENACTMENT— PUBLICATION—TORTS.

*The no-fault automobile insurance act inserts certain words by modification of a section of the civil liability act; therefore, the act does not fall within the "act complete in itself" exception under a section of an article of the Michigan Constitution requiring reenactment and republication because the no-fault act purports as far as tort liability is concerned only to insert certain words, or to substitute one phrase for another (Const 1963, art 4, § 25; MCLA 257.401; 1972 PA 294).*

72. STATUTES—REPEAL—AMENDMENTS.

*An act complete in itself does not assume in terms to revise, alter or amend but repeals all inconsistent acts.*

73. STATUTES—AMENDMENT BY IMPLICATION.

*The words "amendment by implication" in no way constitute a precise semantical test but must be viewed in the context in which they are used.*

74. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— CIVIL LIABILITY ACT—WRONGFUL DEATH ACT—REPEAL BY IMPLI- CATION—INCORPORATION BY REFERENCE.

*The no-fault automobile insurance act leaves it to the public to try to figure out where it fits in with the civil liability and*

*wrongful death acts by inserting and removing words here and there; therefore, the no-fault act is not a permissible repeal by implication and incorporation by reference (MCLA 257.401, 600.2922; 1972 PA 294).*

75. Insurance—Automobiles—No-Fault Automobile Insurance—Statutes—Amendments—Constitutional Law.

*Total omission of any reference to the law to be amended in the no-fault automobile insurance act did not successfully avoid the requirements of a section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length", because, assuming there were no reference to the law to be amended, if a minimal reference such as to "title only" is insufficient, no reference at all is even less sufficient and finding that there is some reference in the no-fault act to the law to be amended, such reference is inadequate (Const 1963, art 4, § 25; 1972 PA 294).*

76. Constitutional Law—Statutes—Amendments—Title of Act—Notice—Publication—Reenactment.

*The purpose of a section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" is to give notice and certainty; obviously, if reference to the title only is not enough for notice and certainty, giving no reference at all is a fortiori not enough; publication provides notice and reenactment of the section altered or amended at length provides certainty (Const 1963, art 4, § 25).*

77. Constitutional Law—Supreme Court.

*Michigan Supreme Court enforces the purposes the people intended in their constitution.*

78. Constitutional Law—Statutes—Title of Act—Amendments—Reenactment—Publication.

*A section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" intends that where there is amendment of prior law "reference to title only" is not enough, there must be reenactment and publication at length so that legislators and the*

*public alike can read for themselves the language of the law as amended without having to pick a word from one act and fill in with a word from another; omission of all reference to the act to be amended and failure to reenact and publish violates that provision of the Constitution (Const 1963, art 4, § 25).*

79. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— OWNERS LIABILITY—AMENDMENTS—TORTS.

*There is an amendment "by reference" to the owners liability statute in the no-fault automobile insurance act because a section thereof makes specific reference to abolition of tort liability arising purely from "ownership" and there is only one statute governing liability purely from "ownership" (MCLA 257.401, 500.3135).*

80. STATUTES—REPEAL—AMENDMENTS—AMENDMENT BY IMPLICATION.

*A subsequent act, if "complete in itself" and which conflicts with a prior act, can repeal but not amend it, although it is sometimes called an "amendment by implication".*

81. STATUTES—AMENDMENT BY IMPLICATION—REPEALS BY IMPLICATION —PARTIAL REPEAL.

*A so-called "amendment by implication" is permissible, if a subsequent act repeals a portion of a prior act by implication and incorporates all the rest of the prior act without any change or amendment, although in reality it is a repeal in part.*

82. STATUTES—REVISION—ALTERATION—AMENDMENTS—TITLE OF ACT —REENACTMENT—PUBLICATION—CONSTITUTIONAL LAW.

*A subsequent act, if it adds to a prior act but is harmonious and not inconsistent with the prior act, is not a "revision, alteration or amendment" within the meaning of a section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" (Const 1963, art 4, § 25).*

83. STATUTES—TITLE OF ACT—AMENDMENTS—REENACTMENT—PUBLICATION—CONSTITUTIONAL LAW.

*Omission of reference to the title of an act to be amended in the amendatory act does not avoid the necessity of reenactment and publication required under a section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" (Const 1963, art 4, § 25).*

84. STATUTES—AMENDMENTS—REENACTMENT—PUBLICATION—CONSTI-
TUTIONAL LAW.

*Reference of some sort to the act to be amended and failure to reenact and publish violates a section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" (Const 1963, art 4, § 25).*

85. INSURANCE—AUTOMOBILES—NO-FAULT AUTOMOBILE INSURANCE— TORTS—AMENDMENTS—REENACTMENT—PUBLICATION—CONSTI- TUTIONAL LAW.

*The no-fault automobile insurance act, by reason of a section thereof providing that notwithstanding any other provision of law, ·tort liability arising from the ownership, maintenance or use within this state of a motor vehicle is abolished except as to specified instances, violates a section of an article of the Michigan Constitution providing that "[n]o law shall be revised, altered or amended by reference to its title only" and that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length" (Const 1963, art 4, § 25; MCLA 500.3135; 1972 PA 294).*

See headnotes 27–35.

Request by the Governor and the Senate for advisory opinion as to constitutionality of 1972 PA 294. Submitted March 9, 1973. (No. 16 March Term 1973, Docket No. 54,503.) Statute declared constitutional June 18, 1973.

*Frank J. Kelley,* Attorney General, and *Harry G. Iwasko, Jr.,* and *Karl S. Vasiloff,* Assistants Attorney General *(L. Harvey Lodge,* of counsel), supporting constitutionality.

*Frank J. Kelley,* Attorney General, and *Joseph B. Bilitzke* and *Paul J. Zimmer,* Assistants Attorney General, on the negative side.

*Amicus Curiae:*

League General Insurance Company and Michi-

gan Credit Union *(Tom Downs* and *Keller, Cohn, Downs & Svenson);* American Insurance Association *(Honigman, Miller, Schwartz & Cohn* [by *James K. Robinson]);* United Automobile Workers —Community Action Program *(Daniel P. Dozier).*

Michigan Trial Lawyers Association *(Harry M. Philo* and *Sheldon L. Miller [Kenneth M. Mogill,* of counsel]).

*Robert E. Keeton.*

State Bar of Michigan *(William G. Reamon).*

M. S. COLEMAN, J.

*FACTS:*

On October 31, 1972 the Michigan Legislature enacted PA 294 "to Amend the Title of Act No. 218 of the Public Acts of 1956" and to add Chapter 31 to the Insurance Code of 1956. Two phrases were deleted from the title and two important ones were added, shown as follows:

"AN ACT to revise, consolidate and classify the laws of the state of Michigan relating to the insurance and surety business; to regulate the incorporation or formation of domestic insurance and surety companies and associations and the admission of foreign and alien companies and associations; to provide their rights, powers and immunities and to prescribe the conditions on which companies and associations organized, existing, or authorized under this act may exercise their powers; to provide the rights, powers and immunities and to prescribe the conditions on which other persons, firms, corporations and associations engaged in an insurance or surety business may exercise their powers; to provide for the imposition of a privilege fee on domestic insurance companies and associations, and the state accident fund; to provide for the imposition of a tax on the business of foreign and alien companies and

associations; to provide for the imposition of a tax on the business of surplus line agents; TO MODIFY TORT LIABILITY ARISING OUT OF CERTAIN ACCIDENTS: TO REQUIRE SECURITY FOR LOSSES ARISING OUT OF CERTAIN ACCIDENTS; to provide for the departmental supervision and regulation of the insurance and surety business within this state; and to provide penalties for the violation of this act, ~~and to repeal certain acts.~~"

The provisions of the new Chapter 31 which are at issue are set forth in § 3135(1), which reads in part:

"A person remains subject to tort liability for non-economic loss caused by his ownership, maintenance or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function or permanent serious disfigurement."

The new provisions become effective on October 1, 1973.

By an Executive Message dated November 22, 1972 Governor William G. Milliken, acting pursuant to art 3, § 8, of the Const of 1963, requested of this Court an advisory opinion with respect to the constitutionality of 1972 PA 294, submitting four questions.

By Senate Resolution 336 of November 28, 1972, the Senate also requested an advisory opinion with respect to this act, submitting three questions.

Pursuant to an order of the Court, a preliminary hearing was held on January 16, 1973.

By order of February 2, 1973, this Court granted the requests of the Governor and the Senate with respect to a total of three questions[1] and requested

---

[1] The Michigan constitutional provision as to advisory opinions is as follows:

"Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon

the Attorney General to file briefs on the affirmative and negative sides of each question and in-

---

solemn occasions as to the constitutionality of legislation after it has been enacted into law but before the effective date." Const 1963, art 3, § 8.

It is important to emphasize the fact that an advisory opinion does not constitute a decision of the Court and is not precedentially binding in the same sense as a decision of the Court after a hearing on the merits. The Court said in the *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82 (1970), that legislation is "clothed with the presumption of constitutionality" and must be sustained if within constitutional limits. The Court indicated that it is "incumbent upon our Court to give effect to the plain and clear intent of the Legislature irrespective of possible view of any Justice or Justices that such intent is unwise or impolitic."

There have been no opinions rendered in this state as to the impact and import of an advisory opinion. Justice BLACK's concurring opinion in *Advisory Opinion re Constitutionality of PA 1966, No 261,* 379 Mich 55 (1967) did address the question. He felt the process to be "nonprecedential and nonadjudicatory". He said at p 67:

"As some respected legal minds seem to forget, this is not a judicial proceeding at all. In no sense, even though an opinion signed by five or more Justices should come to present release, would such an opinion be or become a judicial determination, or a precedent of any kind, or a judgment binding on or enforceable against anyone, *the Court and its membership significantly included.* Mr. Justice FELLOWS, writing for the Court in *Anway v Grand Rapids Railway Co.,* 211 Mich 592, 603, 604 [1920], set all this straight in his typically direct way:

" 'We are mindful of the fact that in seven of the States of the Union (Colorado, Florida, Maine, Massachusetts, New Hampshire, Rhode Island and South Dakota) by the constitutions of those States the legislative or executive departments may request opinions of the Supreme Court on important questions; but we are likewise mindful that such opinions are regarded as expressing the views of the justices and not a judicial determination of the question by the court; and such opinions are not regarded as binding upon the legislature, the executive, or the court itself; indeed, the court does not act as a court in rendering such opinions but as the constitutional advisers of the other departments of the government. *Opinion of the Justices,* 126 Mass 557, 566 [1878]; *State v Cleveland,* 58 Me 564, 573 [1870]; *Green v Commonwealth,* 12 Allen (94 Mass) 155, 164 [1866].' " (Emphasis by the Court.)

The Supreme Court of Rhode Island has recently summarized the legal principles involved in the office of an advisory opinion:

"[I]n giving advisory opinions, the judges of the Supreme Court do not render a decision of the court, but only express their opinions as individual judges, *Opinion to the Governor,* 96 R 358, 191 A 2d 611 (1963); that for this reason such opinions have no binding force * * * ; that questions of fact cannot be entertained * * * ."

vited briefs amicus curiae. Oral arguments were heard on March 9, 1973.

The three questions before the Court are:

1. Does the act embrace more than one object in violation of the following Michigan constitutional limitation: "No law shall embrace more than one object, which shall be expressed in its title." Const 1963, art 4, § 24.

2. Does the "modification or amendment by reference of any other Michigan statutory provisions with respect to the substantive law of torts by reason of section 3135" violate the following Michigan constitutional limitation: "No law shall be revised, altered or amended by reference to its title only. The section or sections of the Act altered or amended shall be reenacted and published at length." Const 1963, art 4, § 25.

3. Are the phrases "serious impairment of body function" and "permanent serious disfigurement" as used in § 3135 of the Act "sufficient for legal interpretation?"

*ISSUES:*

1.

The first question posed by the Court raises the issue of whether the legislation is unconstitutional as violating art 4, § 24, which reads:

"No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title."

Because art 3, § 8 is so new and infrequently used, there is little to draw upon for definite guides. It is safe to say, however, that the constitutional provision authorizing advisory opinions was not intended to encroach upon the right of the people to an adjudicative determination of their particularized claims of unconstitutionality. This opinion constitutes the opinion of the several justices signatory based upon the bare words of the act and unadorned by any facts or combination of facts. It is no more.

The provision has been in every Constitution since 1850.

It is the opinion of the Court that the act does not embrace more than one object and that only one is expressed in the title.

Emphasis is given to the fact that the subject matter constitutes a code and that inherently the scope of a code must be broad enough to encompass the various facets necessary to the drafting of a unified law. If we fail to permit such a design codes may not be enacted in Michigan so long as the "one-object" limitation is present in the constitution.

The title to that which is known as "The Insurance Code of 1956" (MCLA 500.100 *et seq.;* MSA 24.1100 *et seq.),* prior to 1972 included a number of descriptive phrases and provisions all of which related to the insurance and surety business. It was a broad and comprehensive title and was intended, as a reading of it reveals, to cover a comprehensive insurance surety code sectioned from 100 through 8302. It consists of virtually one entire volume of Michigan Compiled Laws Annotated and of Michigan Statutes Annotated.

The title of the Code refers to the consolidation and classification of the insurance-surety business of Michigan, to the regulation of the incorporation of formation of insurance-surety companies, to the admission of foreign companies to do business in Michigan, to the conditions under which the insurance business may operate, to the rights, powers and immunities of businesses operating in the insurance-surety field, to the imposition of a privilege fee on domestic companies and to a tax on foreign companies, to the supervision and regulation of insurance-surety companies within the state and to penalties for violation of the act.

This Code intended to and did and does regulate generally and broadly the insurance-surety business of Michigan. The 1972 Legislature determined to regulate further this business in Michigan by modifying to some extent the tort liability arising out of certain accidents and to require security for losses arising out of such accidents.

In the instant case the amendatory language in the title discloses that the object of the Insurance Code is now to include a modification of accidental tort liability which is intrinsic to the "no-fault insurance concept" or "automobile injury reparation reform" concept. The Legislature might have chosen a different statute to which to append an amendment or a new and separate statute might have been enacted—but either choice would have brought on the same criticisms which have been raised here. Almost certainly, it would then have been argued that it was the Insurance Code which should have been amended.

In any event, all possible presumptions should be afforded to find constitutionality. The amended title should be construed reasonably, not narrowly and with unnecessary technicality.

The addition of the phrases "to modify tort liability arising out of certain accidents; to require security for losses arising out of certain accidents" relates directly to the insurance-surety business. This entails reimbursement of and security for losses, particularly in relationship to motor vehicle accidents. Much of the said business relates to losses from accidental torts. It is and was reasonable and logical for the Legislature to classify the matter herein referred to as related to the Insurance Code. Such action cannot be said to have been prompted by deceit or some ulterior motive. The so-called "logrolling" argument may be valid

in some instances, but does not apply in this case. The Code was in being and had been since 1956. The amendment in question cannot be said to have allowed the passage of a law not fully understood (although the subject matter may be complex and difficult for a layman to understand), or that the amendment brought into the Code subjects having no connection with the Insurance Code. The Legislature and the public were well aware of the intention and context of this legislation. One is safe in assuming that probably no piece of legislation since statehood has received more attention or been more noted than the present change in the automobile injury reparation provisions.

An act may include all matters germane to its object. It may include all those provisions which directly relate to, carry out and implement the principal object. As a review of the cases will show, the purpose of this constitutional limitation is to insure that both the legislators and the public have proper notice of legislative content and to prevent deceit and subterfuge.

The provision was recently discussed in *Maki v East Tawas,* 385 Mich 151 (1971). The majority reaffirmed at p 157 the following principle as quoted in *MacLean v State Board of Control for Vocational Education,* 294 Mich 45 (1940):

" 'The constitutional provision was designed mainly to prevent the legislature from passing laws not fully understood, *Thomas v Collins* [1885], 58 Mich 64; it was intended that the legislature, in passing an act, should be fairly notified of its design, *Attorney General, ex rel. Longyear, v Weiner* [1886], 59 Mich 580; and that legislatures and parties interested might understand from the title that only provisions germane to the object therein expressed would be enacted, *Blades v Board of Water Commissioners of Detroit* [1889], 122 Mich 366; and to avoid bringing into one bill subjects

diverse in their nature and having no necessary connection, but with a view to combining in their favor the advocates of all—or what is commonly spoken of as logrolling in legislation. *State Mutual Rodded Fire Ins. Co. v Foster* [1934], 267 Mich 118.' "

The particular section at issue in *Maki* was declared unconstitutional. The title spoke of immunity from governmental acts of *negligence* while the act itself spoke of immunity from *all* tort liability incurred while engaged in a governmental function. Thus, the section exceeded the scope of the title and was severed from the remainder of the act.

The plaintiffs in *Kuhn v Department of Treasury,* 384 Mich 378 (1971) sought a judgment declaring the state income tax act unconstitutional. In affirming summary judgment for the defendant, the Court said at 387–388:

"Plaintiffs' next contention is that the Act violates Michigan Constitution of 1963, art 4, § 24, because in addition to imposing a tax it appropriates three million dollars to the revenue division of the Department of Treasury to cover initial expenses of administration and enforcement. This Court has long and consistently said that art 4, § 24, and similar 'one object' provisions in earlier constitutions, are to be construed reasonably 'and not in so narrow and technical a sense as unnecessarily to embarrass legislation.' *Ryerson v Utley* (1868), 16 Mich 269, 277, citing *People, ex rel. Drake, v Mahaney* (1865), 13 Mich 481, 494. The object of the Act was to provide for creation and collection of a state income tax. The appropriation in the Act was utterly germane to that object. A statute may authorize the doing of all things which are in furtherance of the general purpose of the Act without violating the 'one object' limitation of art 4, § 24, and so an appropriation in the Act to finance its administration and provisions for disposition of the taxes collected are proper and constitutional."

Similar language was used in *People v Carey,* 382 Mich 285 (1969) in discussing an earlier version of art 4, § 24:

"The main purpose of Const 1908, art 5, § 21, was to prevent the legislature from passing laws not fully understood and to avoid bringing into one bill subjects diverse in their nature and having no necessary connection. It was intended that the legislature, in passing law, should be fairly notified of its design and that the legislature and public might understand from the title that only provisions germane to the expressed object would be enacted."[2]

As indicated above, the goal is notice, not restriction of legislation. This Court, in *Local No 1644, AFSC & ME, AFL-CIO, v Oakwood Hospital Corp,* 367 Mich 79, 91 (1962), said:

"Numerous cases have held that the 'object' of a statute is the general purpose or aim of the enactment. The legislature may empower a body created by it to do everything requisite, necessary or expedient to carry out the principal objective to be attained. *Legislation, if it has a primary object, is not invalid because it embraces more than 1 means of attaining its primary object."* (Emphasis added.)

In *Metropolitan Funeral System Association v Commissioner of Insurance,* 331 Mich 185 (1951), plaintiffs were contesting the constitutionality of an act which required those engaged in the mortuary business to sever all connection with the insurance business. One argument was that the act regulated both the insurance and mortuary busi-

---

[2] *Also see* Justice ADAMS' opinion in *City of Gaylord v Gaylord City Clerk,* 378 Mich 273 (1966) where he quoted Justice COOLEY in saying art 4, § 24

" '[O]ught to be construed reasonably, and not in so narrow and technical a sense as unnecessarily to embarrass legislation.' *Ryerson v. Utley,* 16 Mich 269, 277 [1868], citing *People, ex rel. Drake, v. Mahaney,* 13 Mich 481, 494 [1865]."

ness whereas the title of the act spoke only to the regulation of insurance. This allegedly was a violation of the predecessor to art 4, § 24. In rejecting the claim, the Court quoted at 192 from *Regents of University of Michigan v Pray,* 264 Mich 693 (1933):

" 'Being a codification, the statute necessarily embodies various and somewhat diversified provisions of the drain law. But as against objections here raised, we do not find that the act violates article 5, § 21, of the Constitution, in that it embraces more than one object or because the title is deficient in that it is not sufficiently broad to cover the provisions of the act. Title to a codification statute can scarcely be expected to embody reference to every detail of the act. Such is not the constitutional requirement. If the title fairly apprises legislators and the public generally of the act as a whole, such title is sufficient. *Vernor v Secretary of State,* 179 Mich 157 (Ann Cas 1915D 128) [1914]. If the title is adequate, and the statute contains only that which is germane to its general purposes, it does not offend article 5, § 21, of the State Constitution.' "

Perhaps the most explicit explanation of the purpose behind the one-object provision is found in *Rohan v Detroit Racing Association,* 314 Mich 326 (1946), where the Court at 355–356 quoted the following provisions from *Commerce-Guardian Trust & Savings Bank v Michigan,* 228 Mich 316 (1924):

" 'This provision was adopted in our first Constitution, and has remained in the several subsequent revisions without change. Its purpose and the effect to be given to it by the legislature have been many times discussed and passed upon by this court. It may be said at the outset that the provision is designed to serve two purposes. *First,* to prevent action by the legislature without receiving the concurrence therein of the requisite number of members by—"bringing together into

one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all."—What is commonly spoken of as log-rolling in legislation—and also to prevent clauses being—"inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect." *People, ex rel. Drake, v. Mahaney,* 13 Mich. 481, 494 [1865]. And, *second,* to "challenge the attention" of those affected by the act to its provisions. *People v Wohlford,* 226 Mich. 166, 168 [1924].' "[3]

Precedent is clear and the careful consideration of the various facets of the first question dictates the opinion of the Court that the act embraces only one subject which is expressed in the title.

2.

The second question posed is whether 1972 PA 294 violates art 4, § 25 of the 1963 Michigan Constitution which reads:

"No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length."

The 1850 Michigan Constitution provided in art 4, § 25:

"No law shall be revised, altered or amended by reference to its title only; but the act revised and the section or sections of the act altered or amended shall be re-enacted and published at length."

Except for some punctuation and some rear-

---

[3] To like effect are *Blades v Board of Water Commissioners of Detroit,* 122 Mich 366 (1899), *Wardle v Cummings,* 86 Mich 395 (1891) and *People ex rel Secretary of State v State Insurance Co,* 19 Mich 392 (1869).

rangement of words in the latter half of the provision, this language has continued through to this date (also see 1908 Const, art 5, §§ 21, 22).

The first consideration given to determining the meaning of constitutional language simply should be to read it. It is especially important that we do so in this matter before the Court because interpretations over the years seem to be leading away from the "plain and simple language" of the section.

The language of § 25 is quite clear. It says succinctly and straightforwardly that no law (meaning statutory enactment) shall be revised, altered or amended by reference to its title only. The constitutional language then proceeds to state how it shall be done (i.e., the section[s] of the act in question shall be amended by reenacting and republishing at length).

There are only two sentences in § 25. Although the second word is "law", it is obvious from the reading of the entire section that "law" means act or section of an act. Section 25 is worded to prevent the revising, altering or amending of an act by merely referring to the title of the act and printing the amendatory language then under consideration. If such a revision, alteration or amendment were allowed, the public and the Legislature would not be given notice and would not be able to observe readily the extent and effect of such revision, alteration or amendment.

A second consideration in determining the meaning of constitutional language is the analysis of precedent. How have the courts interpreted this language? In pursuing precedent, those cases decided at a time proximate to the ratification of the constitution are important in that they better reflect the meaning of the language of the constitution at the time it was written.

In this instance, the most important source case is *People v Mahaney,* 13 Mich 481 (1865). As noted above, the language of § 25 first appeared in the 1850 constitution. In *Mahaney,* the Court, speaking through Justice COOLEY, had to resolve several challenges to the enactment of a law "to establish a police government for the city of Detroit". (p 490.) The act called for a transfer of duties of various public officials and repealed all inconsistent acts. The legislation was quite broad for it not only instituted a police government but modified "the powers and duties of sheriffs, constables, water and sewer commissioners, marshals, mayors and justices, and imposes new duties upon the executive and the citizen". (p 497.)

Much of Justice COOLEY's discussion in *Mahaney* is particularly pertinent to the present case. An example is this statement found on pp 496, 497:

"If, whenever a new statute is passed, it is necessary that all prior statutes modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the state would require to be republished at every session, and parts of it several times over, until from the mere immensity of the material, it would be impossible to tell what the law was."

From the arguments presented to this Court, it appears that over 200 statutes might be related in some way to 1972 PA 294. It is conceded that there are others related but not even shown on the computer print-outs.[4] To hold that each of these possibly hundreds of acts or portions thereof, in addition to the subject act, must be reenacted and republished clearly illustrates the unreasonable-

---

[4] *Cf. Alan v Wayne County,* 388 Mich 210, 282–285 (1972).

ness of such an interpretation. To require such a recital would result in the ultimate of confusion.

Further, the constitututional division of powers[5] mandates that the courts not interfere with legislative action by fabricating standards not constitutionally required. Considerations of practicality and common sense indicate that the Legislature must be allowed sufficient discretion at this point, provided that such discretion is exercised within constitutional limitations.

Justice COOLEY stated further in *Mahaney:*

"This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that the legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the changes made in the laws." (p 497.)

This citation indicates that another reason for the language in § 25 is to require that notice be given to the Legislature and the public of what is being changed and the content of the act as revised, altered or amended. This is similar in command to § 24 (see above). The language and content of 1972 PA 294 is entirely sufficient to give that notice.

To continue the language from *Mahaney* at p 497:

"An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in

---

[5] Const 1963, art 3, § 2.

that form for that express purpose. Endless confusion was introduced into the law, and the constitution wisely prohibited such legislation."

1972 PA 294 does not violate these standards set forth in this reference. It does not revise, alter or amend in such prohibited fashion.

*Mahaney* then ruled:

"But an act complete in itself is not *within the mischief designed to be remedied by this division and cannot be held to be prohibited by it without violating the plain intent."* (p 497.) (Emphasis added.)

The subject act details all that is required for institution of a "no-fault" system of motor vehicle insurance. It is an act complete within itself. It falls squarely within the rule set forth in *Mahaney*.[6]

It is argued, however, that there can be no supplemental or partial alterations to an act which are inconsistent with or which otherwise do violence to any other statute. That language is not in the constitution. It is not our function to introduce it therein. This is not a matter of policy nor a question of whether the provision can be interpreted so as to apply to a newly perceived problem. We should not ask "What *can* it mean?" Rather, we must determine "What *does* the constitution require?" Our task is to apply the constitution as adopted by the people. We cannot and should not attempt to anticipate and resolve all imagined difficulties.

In attempting to determine what § 25 requires, we have sought guidance from the debates which

---

[6] *Also see, In re Roberts,* 51 Mich 548 (1883); *Evans Products Co v State Board of Escheats,* 307 Mich 506 (1943); *Checker Mutual Automobile Insurance Co v Wayne Circuit Judge,* 330 Mich 553 (1951) and *In re Wright,* 360 Mich 455 (1960).

occurred in the conventions convened to write the
1963, 1908 and 1850 constitutions. None was en-
lightening as to the specific intent which prompted
passage of § 25.

In *A Comparative Analysis of the Michigan
Constitution,* prepared for the last convention by
the Citizens Research Council of Michigan, it was
noted that procedure in the United States Con-
gress differed in that it was the practice there "to
amend laws by reference to their title only and to
set forth only the amendatory language in the
bill" (p 85). It was said at p 85 that the "Michigan
practice, requiring bills to set forth the text of the
whole section to be amended, is salutory in that it
places the proposed amendment in context." There
is no indication here of the theory that every
statute affected by the new act must be repub-
lished or reenacted.

Attention is also directed to Justice COOLEY's
discussion of enactment of laws which comprises
ch VI of his Constitutional Limitations (5th ed). In
this chapter, he focuses on the predecessor to § 25.
After quoting the passage from *Mahaney* set forth
on p 497 *supra,* he said at 182:

"If this is a correct view of the purpose of the provi-
sion, it does not seem at all important to its accomplish-
ment that the old law should be republished, if the law
as amended is given in full, with such reference to the
old law as will show for what the new law is substituted
* * * ."

He further wrote at p 183:

"[S]tatutes which amend others by implication are
not within this provision; and it is not essential that
they even refer to the acts or sections which by implica-
tion they amend."

This analysis by Justice COOLEY and the inter-
pretation of the Citizens Research Council rein-
force the determination that § 25 is directed at
preventing undesirable conduct with respect to
amendment of a particular act. It does not seek to
correct tangential effects which the amendment,
revision or alteration may have on those statutes
not directly affected.

At this juncture, consideration should be given
to *Mok v Detroit Building and Savings Association
No 4,* 30 Mich 511 (1875). There an 1869 act
provided a procedure for incorporating building
and savings associations which required reference
to an 1855 act. This in turn directed the reader to
refer to an 1853 act which dealt with the creation
of mining corporations. The 1869 act did alter
some of the procedures and requirements of the
1853 act. This scheme was found to violate the
constitution.

The actual hard fact in the *Mok* case was that
the act of 1869, taken in connection with that of
1853 (and an act of 1855) did not furnish any
distinct outline or prescribe any definite course of
action by which associations could be sufficiently
guided in perfecting organizations under it. The
two acts had purposes and objects so entirely
different it was impossible to determine what part
of the general and manufacturing incorporations
act was meant to be applied to the building and
savings corporation.

In that case, there were amendments by refer-
ence that patently were contrary to the constitu-
tion and so are distinguishable from the matter of
1972 PA 294. In the matter before us, there is no
attempt to alter or amend the statute by reference
or by striking out or insertion of words without
reproduction of the statute in its amended form.
(See *Mok,* pp 515–517).

*Alan v Wayne County,* 388 Mich 210 (1972) also
is distinguishable. There the offending statutory
language was not an amendment by implication.
As Justice WILLIAMS said at p 270:

"This is not a case of so-called 'amendment by impli-
cation' such as cases which were considered and held
valid in *People v Mahaney,* 13 Mich 481, 496 (1865)
(transfer of powers from one statute to another is not
an 'amendment' requiring republication); *Underwood v
McDuffee,* 15 Mich 361, 366 (1867) (overall revision of
statute and system of references adding new sections
with the reference number of an old one is permissible
where new section is not foreign to subject indicated by
title of law in which inserted); *People v Wands,* 23 Mich
384, 388–389 (1871) (an amending act which properly
amends two sections of law may have the effect of
amending by implication other parts of the same body
of law); *Swartwout v Mich Airline R Co,* 24 Mich 388,
399 (1872) (following *Wands* in holding that a new
statute which adds a new section to a body of law may
amend by implication other sections of the same body of
law); and a continuing line of cases not cited here."

In speaking of *Mok,* Justice WILLIAMS also said:

"The Court noted that it was confusing to be sent by
the act of 1869 to the act of 1855 only to be told to turn
to the act of 1853 * * * ."

The so-called "No-Fault Insurance" amendment
modifies the title of and adds a chapter to the
Insurance Code. It is a complete act and does not
confuse or mislead, but publishes in one act for all
the world to see what it purports to do.

We emphasize the philosophy that constitutional
language must be given reasonable and practical
interpretations.[7] We must not extend and expand

---

[7] *See, North Carolina v Alford* 400 US 25, 37; 91 S Ct 160; 27 L Ed
2d 162 (1970): "[T]he Constitution is concerned with practical conse-
quences."

the wording out of its original context and meaning in order to respond to imagined or even real mischief.

Amendments by implication are an inevitable by-product of the legislative scheme of government. It boggles the mind to contemplate the laws which would be rendered unconstitutional *ab initio* and the avalanche of litigation which would follow were we to construe § 25 in so extended a manner as to find unconstitutional its effect upon 1972 PA 294.

This act does not purport by its terms to directly revise, alter or amend any act or section of an act other than the Insurance Code. It does amend the title of the Insurance Code *and* it sets forth in full the additions to the body of the Code. To the extent which this act cuts across and affects other acts, it does not present the kind of problem toward which this constitutional provision is directed.

The notice requirement of § 25 has been met, the enactment standards have been met and the act is complete within itself and meets the test of constitutionality as applied by art 4, § 25 of the Michigan Constitution.

3.

The final question is whether the phrases "serious impairment of body function" and "permanent serious disfigurement" provide standards sufficient for legal interpretation.

This Court holds that such phrases are capable of legal interpretation and, indeed, that juries or judges sitting without juries frequently have and do interpret comparable phrases bearing upon various facets of the law. Such findings result from

denominated fact questions and thus are within the exclusive province of the triers of fact. Only when interpretation approaches or breaches permissible limits does it become a question of law for the Court. Such questions must be approached on a case by case basis.

When construing a statute, the Court must give effect to the legislative intent and read the language in the light of the general purpose sought to be accomplished.[8]

MCLA 8.3; MSA 2.212, reads:

"In the construction of the statutes of this state the rules stated in sections 3a to 3w shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature."

Section 3a of said statute (MCLA 8.3a; MSA 2.212[1]) instructs:

"All words and phrases shall be construed and understood according to the common and approved usage of the language * * * ."

Although there is a paucity of Michigan cases bearing upon the interpretation of "serious impairment of body function" because our laws have not employed such language heretofore, the word "serious" has been construed from early dates.[9] Relevant cases from other jurisdictions appear by footnote.[10]

---

[8] *Ballinger v Smith,* 328 Mich 23 (1950).

[9] *See, Brown v Metropolitan Life Insurance Co,* 65 Mich 306 (1887).

[10] *Accident Insurance Co v Crandal,* 120 US 527; 7 S Ct 685; 30 L Ed 740 (1887). (Bodily infirmities or diseases.) *American Nat Ins Co v Denman,* 260 SW 226 (Tex Civ App, 1924). (Bodily disease or illness.) *State of California v Industrial Accident Commission,* 147 Cal App 2d 818; 306 P2d 64 (1957). (Permanent partial, disability or impairment. Loss of function of the body in whole or part.) *Corniak v Cohen,* 150 Pa Super 140; 27 A2d 560 (1942). (Permanent loss or loss of use.) *Crown Products Co v Brandenburg,* 126 Ind App 48; 129 NE2d 134

Phrases comparable to "permanent serious disfigurement" have confronted courts over the years and there has been no apparent reluctance to construe the terminology.[11]

(1955). (Impairment is loss of a function. Permanent partial impairment.) *Davey v Aetna Life Ins Co,* 20 F 482 (CC D NJ, 1884). (Impairment of health.) *Edward Iron Works v Thompson,* 80 Ind App 577; 141 NE 530 (1923). (Impairment is loss of a function.) *Guardian Life Ins Co of America v Richardson,* 23 Tenn App 194; 129 SW2d 1107 (1939). (Disabled by bodily injury or disease.) *Inman v Carl Furst Co,* 92 Ind App 17; 174 NE 96 (1930). (Impairment refers to total or partial loss of function of member or of body as a whole.) *State of Kansas v Brown,* 181 Kan 374; 312 P2d 832 (1957) (Bodily harm.) *Northwestern Barb Wire Co v Industrial Commission,* 353 Ill 371; 187 NE 468 (1933). (Permanently ceased to function.) *Novak v State Workmen's Insurance Fund,* 113 Pa Super 555; 173 A 827 (1934). (Loss of use.) *People v Tanner,* 3 Cal 2d 279; 44 P2d 324 (1935) (Bodily harm.) *Provident Life & Accident Ins Co v Campbell,* 18 Tenn App 452; 79 SW2d 292 (1934). (Bodily injuries.) *Smith v L H Gilmer Co of Louisiana,* 11 La App 336; 123 So 451 (1929). (Serious permanent impairment of physical function.) *Spillers v Jonesboro Gin Co,* 193 So 509 (La App, 1939). (Serious and permanent impairment of the usefulness of a physical function.) *Tarr v Industrial Accident Commission,* 164 Cal App 2d 834; 331 P2d 417 (1958). (Impairment is loss of hearing.) *Terre Haute Electric R Co v Lauer,* 21 Ind App 466; 52 NE 703 (1899). (Bodily injuries.) *Vukelich v Industrial Commission of Utah,* 62 Utah 486; 220 P 1073 (1923). (Loss of bodily function.)

[11] *Brandt v C F Smith & Co,* 242 Mich 217 (1928). (Injury was permanent in character.) *Deneen v Houghton County Street-Railway Co,* 150 Mich 235 (1907). (Injury was permanent.) *Fogel v Sinai Hospital of Detroit,* 2 Mich App 99 (1965). (Permanent injuries.) *Fortin v Bay City Traction & Electric Co,* 154 Mich 316 (1908). (Permanent injury; impairment.) *Kethledge v Petoskey,* 179 Mich 301 (1914). (Permanent injuries.) *Main v Grand Rapids, G H & M R Co,* 207 Mich 473 (1919). (Permanently injured; physical impairment; permanently disfigured.) *McDuffie v Root,* 300 Mich 286 (1942). (Seriously and permanently injured; permanent physical defect.) *Ott v Wilson,* 216 Mich 499 (1921). (Permanent injury.) *Tabor v Carey & Leach Bus Lines,* 242 Mich 9 (1928). (Injuries were permanent.)

Other Jurisdictions:

*Arkin v Industrial Commission of Colorado,* 145 Colo 463; 358 P2d 879 (1961). (Seriously permanently disfigured.) *Branham v Denny Roll & Panel Co,* 223 NC 233; 25 SE2d 865 (1943). (Permanent and serious disfigurement.) *Bethlehem—Sparrows Point Shipyard, Inc v Damasievwicz,* 187 Md 474; 50 A2d 799 (1947). (Permanent disfigurement.) *Bowen v Chiquola Manufacturing Co,* 238 SC 322; 120 SE2d 99 (1961). (Serious bodily disfigurement.) *Cagle v Clinton Cotton Mills,* 216 SC 93; 56 SE2d 747 (1949). (Bodily disfigurement; serious facial disfigurement.) *Davis v Sanford Construction Co, Inc,* 247 NC 332; 101 SE2d 40 (1957). (Serious facial or head disfigurement; serious bodily disfigure-

A reading of the Standard Jury Instructions for civil cases indicates further the wide range of questions which our Court permits triers of fact to decide. For example, in negligence cases the jury is permitted to determine "what a reasonably careful person would do or not do" under the circumstances (10.01). It is permitted to determine questions of "contributory negligence" (11.01), "willful and wanton misconduct" (14.02), "gross negligence" (14.03), "proximate cause" (15.01) and "in-

---

ment.) *Dawkins v Commonwealth*, 186 Va 55; 41 SE2d 500 (1947). (Permanently disabled.) *Dombrowski v Fafnir Bearing Co*, 148 Conn 87; 167 A2d 458 (1961). (Serious and permanent disfigurement.) *J J Grady Co v The Industrial Commission*, 46 Ill 2d 471; 263 NE2d 809 (1970). (Serious and permanent disfigurement.) *General Motors Corp v Shannon*, 52 Del 221; 155 A2d 237 (Del Super, 1959). (Serious and permanent facial or head disfigurement.) *Godfrey v Watts Mills*, 199 SC 437; 19 SE2d 902 (1942). (Serious body disfigurement.) *Hamilton v Little*, 197 SC 434; 15 SE2d 662 (1941). (Bodily disfigurement.) *Haynes v Ware Shoals Mfg Co*, 198 SC 75; 15 SE2d 846 (1941). (Serious and permanent disfigurement.) *Jewel v Pond Co*, 198 SC 86; 15 SE2d 684 (1941). (Serious disfigurement.) *Jones v General Accident Fire and Life Assurance Corp*, 1 La App 88 (1924). (Seriously permanently disfigured.) *Kelly v Postal Telegraph-Cable Co*, 204 SC 530; 30 SE2d 369 (1944). (Serious bodily disfigurement.) *Lee v Commonwealth*, 135 Va 572; 115 SE 671 (1923). (Permanent disfigurement.) *Manning v Gossett Mills*, 192 SC 262; 6 SE2d 256 (1939). (Serious bodily disfigurement.) *Mitchum v Inman Mills*, 209 SC 307; 40 SE2d 38 (1946). (Serious facial disfigurement.) *State of New Mexico v Ortega*, 77 NM 312; 422 P2d 353 (1966). (Serious disfigurement.) *Parrott v Barfield Used Parts*, 206 SC 381; 34 SE2d 802 (1945). (Serious bodily disfigurement.) *Pavik v Glen Alden Coal Co*, 140 Pa Super 165; 14 A2d 161 (1940). (Serious and permanent disfigurement.) *Poole v Saxon Mills*, 192 SC 339; 6 SE2d 761 (1940). (Serious facial or head disfigurement.) *Phillips v Coxe Brothers & Co Inc*, 135 Pa Super 185; 5 A2d 445 (1939). (Disfigurement.) *Rapp v Kennedy*, 101 Ill App 2d 82; 242 NE2d 11 (1968). (Disfigurement.) *Shillinglaw v Springs Cotton Mills*, 209 SC 379; 40 SE2d 502 (1946). (Serious bodily and facial disfigurement.) *Skelly Oil Co v Skinner*, 162 Okla 150; 19 P2d 548 (1933). (Serious and permanent disfigurement.) *Smith v Daniel Construction Co*, 253 SC 248; 169 SE2d 767 (1969). (Serious bodily disfigurement.) *State v Nieuhaus*, 217 Mo 332; 117 SW 73 (1909). (Disfiguring.) *Stone v Ware Shoals Mfg Co*, 192 SC 459; 7 SE2d 226 (1940). (Serious bodily disfigurement.) *Superior Mining Co v Industrial Commission*, 309 Ill 339; 141 NE 165 (1923). (Permanent and serious disfigurement.) *Tinsley v Walgreen Drug Co*, 197 SC 415; 15 SE2d 667 (1941). (Serious bodily disfigurement.) *Vick v Springs Cotton Mills*, 209 SC 372, 40 SE2d 409 (1946). (Serious facial disfigurement.)

tervening negligence" or "outside force" (15.05, 15.06).

The jury must also decide the amount of damages to be awarded in order "reasonably, fairly and adequately" to compensate the injured party (30.01). The jury may decide if the injury is "continuing" or "permanent" (30.01). The jury may determine "the reasonable expenses of necessary medical care, treatment and services" (30.05) and "the loss of earning capacity" (30.06). In wrongful death actions, the jury may determine awards for losses of "parental training and guidance" or "society and companionship".

Clearly the subject phrases "serious impairment of body function" and "permanent serious disfigurement" as used in § 3135 of this act are comprised of no less commonly used or understood words of the English language, nor is the language presently before the Court less precise than that which has been adopted to express other standards for determining tort liability. The phrases are within the province of the trier of fact and are sufficient for legal interpretation.

T. E. BRENNAN, T. G. KAVANAGH, SWAINSON, and LEVIN, JJ., concurred with M. S. COLEMAN, J.

LEVIN, J., *(concurring)*. The Governor and the Senate requested an advisory opinion on the three questions to which we today respond and, in addition, asked us to furnish an advisory opinion on the questions whether "the modification of tort liability arising out of motor vehicle accidents defined in section 3131" of the no-fault motor vehicle liability act (1972 PA 294) violates the Federal and state constitutional guarantees of equal protection of the laws and due process of law.

When we issued our order agreeing to respond to the three questions and thereby, in effect, declining to respond to the equal protection and due process questions, we said, prefatorily, "In light of the nature of the questions, the nature of an advisory opinion, and the limitations of time, the requests of the Governor and the Senate are granted to the following extent". We did not elaborate on the considerations which prompted us to decline to respond to the equal protection and due process questions.

I have signed Justice M. S. Coleman's opinion. I write separately to explain my reasons for joining in the Court's refusal to answer the equal protection and due process questions posed by the Governor and the Senate. I also wish to make some additional observations regarding two of the three questions to which we do respond, the questions asking whether the act violates the Michigan constitutional limitations prohibiting a law from embracing more than one object (art 4, § 24), and prohibiting revision, alteration or amendment of a law by reference to its title only and requiring reenactment and publication of the altered or amended section (art 4, § 25).

I

The Michigan constitutional provision concerning advisory opinions reads as follows:

"Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date." Const 1963, art 3, § 8.

Michigan's Constitution, thus, restricts advisory opinions to

—important questions of "law",

—concerning the "constitutionality" of legislation,

—"upon solemn occasions" when requested by either house of the Legislature or the Governor,

—after the legislation has been enacted into law but before the effective date.

It would appear, therefore, that in the context of an advisory opinion, we may not examine questions of fact, and questions concerning the interpretation or construction of a statute may not be considered except as those questions affect a constitutional question.

Opponents of the no-fault act requested an opportunity to present evidence at a hearing in support of claims that aspects of the act deny equal protection and due process to persons in general and some classes of persons in particular. A proponent of the act responded that an evidentiary hearing was unnecessary because "adjudicative facts" would not be pertinent to our inquiry. The only facts we need consider, he contended, are "constitutional facts", which could be brought to our attention by written submissions.

No doubt, some particularized claims of unconstitutionality could be decided without consideration of any facts. And others could be resolved on constitutional facts without hearing adjudicative facts. Some other particularized claims, however, would require adjudicative fact finding. I was of the opinion that we could not prudently proceed on the assumption that the specific constitutional issues adumbrated by the equal protection and due process questions could authoritatively be answered without hearing any evidence and without any findings on factual issues.

Although an advisory opinion is not an adjudica-

tive decision of the Court and is not binding in the same sense a decision of the Court after a hearing on the merits constitutes a precedent under the doctrine of stare decisis, our advisory opinions are read by the public, the profession, the Governor and the Senate as a definitive expression of our views. Any such expression must be carefully circumscribed so as not to inhibit a seemingly different determination in a case where the contending parties have had an opportunity to present relevant facts, adjudicative as well as constitutional.

When a court holds an act to be constitutional it does no more than deny a particular claim of unconstitutionality. It ought not, by premature expressions on generalized abstract claims, to appear to foreclose persons differently situated from advancing more concrete claims of unconstitutionality.

The equal protection and due process questions posed by the Governor and the Senate did not particularize any claims of unconstitutionality. It is not properly within our function to hypothesize particularized claims or to set up, speculatively, strawmen classes of persons who might claim to be disadvantaged in various ways by the classifications and provisions of the act.

The Michigan Trial Lawyers Association did, indeed, propound 17 questions particularizing claims on behalf of identifiable classes of persons, *e.g.,* (a) motor cycle owners and operators; (b) retirees, unemployed persons, housewives, students, and young children; (c) persons with vehicle property damage claims as compared to those who suffer other property damage losses; (d) poor persons as they are affected by the mandatory insurance requirement. A representative of the insurance section of the State Bar of Michigan pro-

pounded 19 questions particularizing additional claims of unconstitutionality.[1]

We are not, however, constitutionally authorized to furnish advisory opinions to the Michigan Trial Lawyers Association or a committee of the State Bar. The breadth of the equal protection and due process questions posed by the Governor and the Senate could not properly be fleshed out by the particularized claims set forth in the briefs of counsel for the contending groups.

I was, therefore, of the opinion that we should decline to answer the equal protection and due process questions because they failed to delineate particularized claims of unconstitutionality on behalf of persons generally or specific classes of persons, because it might be necessary to hear testimony, consider other evidence and make findings of fact in order to determine authoritatively the merits of some particularized claims of unconstitutionality, and because any expression sustaining the constitutionality of the act, unless carefully circumscribed, might prejudice a fair adjudication of a subsequent meritorious claim presented for the first time after an evidentiary hearing.

In 1923, before the Equal Protection Clause had become a preeminent battle ground of constitutional adjudication in controversies between the citizen and the state, Felix Frankfurter, then a Harvard Law School professor, wrote a perceptive article on advisory opinions. His analysis is applicable to equal protection claims as well as claims arising under the Commerce Clause and Due Process Clause dealt with in the article:

---

[1] In this connection, it should be observed that the Court could not properly have undertaken to respond to such a large number of questions within the limited time a response is required. To have done so would have unduly impinged upon the Court's other responsibilities.

"Since Reconstruction days, the acutest controversies which have come before our Supreme Court, and increasingly will come, cluster around the Commerce Clause and Due Process. These issues concern, in effect, a delimitation between the powers of the Nation and those of the States and the eternal conflict between the freedom of the individual and his control by society. The stuff of these contests are facts, and judgment upon facts. Every tendency to deal with them abstractedly, to formulate them in terms of sterile legal questions, is bound to result in sterile conclusions unrelated to actualities. The reports are strewn with wrecks of legislation considered *in vacuo* and torn out of the context of life which evoked the legislation and alone made it intelligible. These are commonplaces. But they are the heart of the matter of American constitutional law. * * *

"Concepts like 'liberty' and 'due process' are too vague in themselves to solve issues. They derive meaning only if referred to adequate human facts. Facts and facts again are decisive. * * * Not the least of constitutional controversies resolve themselves into the pressure of new facts against the resistance of inadequate or exploded facts persisting as legal assumptions. The reports furnish too abundant illustrations of what Huxley called the tragedy of a fact killing a theory. * * *

"Legislation is an appeal to 'judgment from experience as against a judgment from speculation.' Unless we are to embrace fatalism, legislation to a considerable extent must necessarily be based on probabilities, on hopes and fears, and not on demonstration. To meet the intricate, stubborn, and subtle problems of modern industrialism, the legislature must be given ample scope for putting its prophecies to the test of proof. But to submit legislative proposals to the judicial judgment, instead of the deliberate decision of the legislature, is to submit legislative doubts instead of legislative convictions. The whole focus of the judicial vision becomes thereby altered.

"Moreover, legislation is thus deprived of its creative function. The history of modern legislation is rich in proof that facts may be established in support of measures although not previously in existence. The acci-

dents of litigation may give time for the vindication of laws which *a priori* may run counter to deep prepossessions or speculative claims of injustice. The whole milieu of advisory opinions on proposed bills is inevitably different from that of litigation contesting legislation. However much provision may be made on paper for adequate arguments (and experience justifies little reliance) advisory opinions are bound to move in an unreal atmosphere. The impact of actuality and the intensities of immediacy are wanting. In the attitude of court and counsel, in the vigor of adequate representation of the facts behind legislation (lamentably inadequate even in contested litigation) there is thus a wide gulf of difference, partly rooted in psychologic factors, between opinions in advance of legislation and decisions in litigation after such proposals are embodied into law. Advisory opinions are rendered upon sterilized and mutilated issues. * * *

"It must be remembered that advisory opinions are not merely advisory opinions. They are ghosts that slay." Frankfurter, *A Note on Advisory Opinions,* 37 Harv L Rev 1002, 1002–1006, 1008 (1924).

The three questions to which we do respond satisfy the criteria for an advisory opinion in that they advance sufficiently particularized claims of unconstitutionality, adjudicative fact finding is not required and the scope of our opinion should not be subject to misinterpretation and should not prejudice adjudication of future actual cases.

## II

The no-fault motor vehicle liability act—enacted as a new and separate chapter of the Insurance Code—changes the present system of compensating victims of automobile accidents by requiring an owner of a motor vehicle to maintain "security" (which for most citizens means purchasing insurance) for the payment of no-fault and other benefits to himself and others, and by modifying

the liability for negligent driving of a motor vehicle.[2]

It has been contended that the no-fault act violates limitations in Michigan's Constitution because

(1) The concept embodied in this new chapter of the Insurance Code is not within the "object" of the Code, with the result that the Code now embraces more than one object in violation of Const 1963, art 4, § 24, and

(2) The no-fault act alters or amends earlier acts, thereby violating Const 1963, art 4, § 25, which prohibits amendment by reference to the title only and requires that the altered or amended sections be reenacted and published at length.

## The one-object limitation, art 4, § 24

The word "object" expresses an intrinsically elastic concept. The viewer's focus defines the

---

[2] Section 3135 of the no-fault act (MCLA 500.3135; MSA 24.13135) modifies "tort liability" arising from the ownership, maintenance or use of a motor vehicle for which security is in effect, *e.g.,* an insured vehicle.

Since tort liability for this purpose (excluding the law of nuisance as not truly pertinent) could be divided into intentionally and negligently caused harm and § 3135 excepts from modification intentionally caused harm, the modification of *tort* liability is essentially a modification of the law of negligence as applied to insured motor vehicles.

There are further excepted damages for "allowable expenses, work loss and survivor's loss" in excess of the daily, monthly and three-year limitations, and damages for non-economic loss "if the injured person has suffered death, serious impairment of body function or permanent serious disfigurement".

The result is that the no-fault act modifies tort liability by eliminating the common-law liability for negligent driving of an insured automobile in those cases where the injuries caused do not result in either death, in serious impairment of body function, or in permanent serious disfigurement. However, even if the injuries are not so serious, the negligent tortfeasor remains liable if the injured person's damages for allowable expenses, work loss and survivor's loss exceed the daily, monthly and three-year limitations contained in the act.

object, determining in the main whether the dimensions of the object are microscopic or macrocosmic in size.[3]

Codification of multifarious enactments would be impossible if the constitution obliges the Legislature to define the object of a codification in narrow terms. Especially in the case of a codification, the Legislature is free to conceive of the object of its endeavors in terms of a common denominator and to express that conception in umbrella words.[4]

The Uniform Commercial Code will illustrate. The UCC replaced separate laws on sales,[5] stock transfer,[6] negotiable instruments,[7] bulk sales,[8] wa-

[3] "(T)he 'object' of a statute is the general purpose of aim of the enactment." *Local No 1644, AFSC & ME, AFL-CIO v Oakwood Hospital Corp,* 367 Mich 79, 91 (1962).

[4] *See People v State Insurance Co,* 19 Mich 392, 398 (1869), where Mr. Justice COOLEY wrote for the Court:

"Now the object may be very comprehensive and still be without objection, and the one before us is of that character. But it is by no means essential that every end and means necessary or convenient for the accomplishment of the general object, should be either referred to or necessarily indicated by the title. All that can reasonably be required is, that the title shall not be made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection."

Similarly, *see Regents of University of Michigan v Pray,* 264 Mich 693, 697 (1933), where Mr. Justice NORTH wrote for the Court:

"Being a codification, the statute necessarily embodied various and somewhat diversified provisions of the drain law. But as against objections here raised, we do not find that the act violates article 5, § 21, of the Constitution, in that it embraces more than one object or because the title is deficient in that it is not sufficiently broad to cover the provisions of the act. Title to a codification statute can scarcely be expected to embody reference to every detail of the act. Such is not the constitutional requirement. If the title fairly apprises legislators and the public generally of the purposes of the act as a whole, such title is sufficient. *Vernor v Secretary of State,* 179 Mich 157 (Ann Cas 1915D, 128) [1914]. If the title is adequate, and the statute contains only that which is germane to its general purposes, it does not offend article 5, § 21, of the State Constitution [of 1908]."

[5] 1913 PA 100.

[6] 1913 PA 106.

[7] 1905 PA 265.

[8] 1905 PA 223.

rehouse receipts,[9] bills of lading,[10] bank checks,[11] motor vehicle installment sales contracts,[12] trust receipts,[13] fraudulent conveyances,[14] discharge of chattel mortgages,[15] foreclosures of chattel mortgages,[16] liens on inventory[17] and many more. When first enacted, each of these separate laws stated its own separate object. However, when coalesced in the UCC, the separate objects became submerged in the grand single object of codifying in one unified statute all the formerly separate statutes and objects.

Similarly, the Revised Judicature Act contains chapters and sections on diverse subjects,[18] all of

[9] 1909 PA 303.

[10] 1911 PA 165.

[11] 1931 PA 240.

[12] 1950 PA (Ex Sess) 27.

[13] 1952 PA 19.

[14] RS 1846, ch 81.

[15] 1881 PA 117.

[16] 1939 PA 290.

[17] 1947 PA 180.

[18] In addition to the provisions concerning the establishment of courts and court procedures, the Revised Judicature Act deals with such diverse subjects, originally enacted as separate statutes with separate objects, as the prohibition of actions for alienation of affections (the heartbalm act), 1935 PA 127; 1948 CL 551.301, now MCLA 600.2901; MSA 27A.2901; abolition of the defense of governmental function resulting from the negligent operation of a motor vehicle, 1945 PA 127; 1948 CL 691.151, now MCLA 600.2904; MSA 27A.2904; limitation on the liability of a merchant for conduct involving persons suspected of larceny of goods, 1958 PA 182; 1948 CL 692.861, now MCLA 600.2917; MSA 27A.2917; the wrongful death act itself, 1848 PA 38; 1948 CL 691.581, 691.582, now MCLA 600.2922; MSA 27A.2922; the contribution among joint tortfeasors' act, 1941 PA 303; 1948 CL 691.561–691.564, now MCLA 600.2925; MSA 27A.2925; assignments for the benefit of creditors, 1879 PA 198; 1897 CL 9539, *et seq.,* now MCLA 600.5201; MSA 27A.5201; assignments of accounts receivable, 1945 PA 309; 1948 CL 691.901, *et seq.,* subsequently MCLA 600.5401, *et seq.;* MSA 27A.5401, *et seq.*

The assignments of accounts receivable act as codified by the Revised Judicature Act was repealed when its substance became embodied in the Uniform Commercial Code. If the subject of assignments of accounts receivable was within the object of the Revised Judicature Act, how could that subject also be within the object of the

which were first enacted as separate laws and later brought together in the codifications of 1915 and 1961. The Insurance Code itself is another example.[19]

In this instance, instead of enacting a separate no-fault act, the Legislature chose to add the no-fault act as a new chapter of an earlier codification, the Insurance Code.

The object of the no-fault act is reform of the present system of compensating persons injured by automobiles.[20] The generally stated object of the Insurance Code is the codification of the laws "relating to the insurance and surety business". So stated, the objects of the no-fault act and the Insurance Code may appear different.

The no-fault act has two principal features. It requires, in effect, compulsory insurance coverage providing no-fault and other benefits and modifies the liability for negligent motor driving.

Manifestly, the compulsory insurance feature of the no-fault act is within the object of a code of laws relating to the insurance business.

Turning to the modification of negligence liability feature, the widely declared purpose of the no-fault act is to reduce the cost of automobile insurance and to increase the proportion of the premium dollar ultimately paid to injured persons.

---

Uniform Commercial Code?—only by finding in each enactment a common denominator with other provisions of the enactment.

[19] See 1917 PA 256, the schedule of repealed laws is over two solid pages; 1956 PA 218, enacting the current Insurance Code.

[20] To that end it (a) requires every owner or registrant of a motor vehicle to maintain security for payment of benefits under personal protection insurance, property protection insurance, and residual liability insurance; (b) provides for no-fault benefits and imposes limitations on the benefits payable; (c) provides protection against uninsured motorists; (d) imposes limitations on conventional tort liability and (e) supersedes inconsistent laws.

(These goals may not be realized. Some proponents of no-fault automobile insurance no doubt have other purposes. The worst fears of the opponents of this legislation may come to pass. Such considerations are not, however, properly within the scope of this advisory opinion.)

A considerable portion of all collectible liability for negligent motor driving is funded with insurance. Legislation designed to increase the cost effectiveness of insurance by redefining the scope of the insured person's liability is germane[21] to, and, therefore, within the object of an act relating to the insurance business.[22]

The no-fault act is not the first legislative definition of the risk insured. In 1905, the Legislature prescribed a standard fire insurance contract (1905 PA 277), and thereby defined the risk insured under a fire insurance policy.[23] That act, which had a separate object when originally enacted, is now, as subsequently modified, a part of the Insurance Code.[24] Chapters 30, 34, 40 and 42 of the Insurance Code contain sections regulating provisions of casualty insurance, disability insurance, life insurance and annuity and industrial life insurance contracts.[25]

In conclusion, redefining the risk insured is within the object of a codification of laws relating

---

[21] *See Maki v East Tawas,* 385 Mich 151, 157–158 (1971); *Loomis v Rogers,* 197 Mich 265, 270–271 (1917).

[22] *Cf. Metropolitan Funeral System Association v Commissioner of Insurance,* 331 Mich 185 (1951).

[23] Even before the enactment of 1905 PA 277, the Legislature had regulated the risk insured. See, *e.g.,* 1897 PA 167, §§ 2 and 3, 1897 CL 5181–5182.

[24] MCLA 500.2832; MSA 24.12832.

[25] *See, e.g.,* MCLA 500.3004, 500.3006, 500.3008, 500.3009, 500.3010, 500.3012, 500.3020, 500.3402, 500.3406–500.3424, 500.4008–500.4036, 500.4204–500.4238; MSA 24.13004, 24.13006, 24.13008, 24.13009, 24.13010, 24.13012, 24.13020, 24.13402, 24.13406–24.13424, 24.14008–24.14036, 24.14204–24.14238.

to the insurance business. The no-fault act is within the object of the Insurance Code as originally enacted.[26]

The question posed by the Governor and Senate under art 4, § 24—the singleness of the object—does not raise other questions which might arise under this constitutional provision. For reasons already stated in part I of this opinion, we cannot properly consider and, therefore, do not reach the additional questions posed in the brief filed by opponents of the act who contend that provisions of the act exceed and do not conform to the "attempted title object", and that fair notice of other provisions is not provided in the title.[27] I have no reservations on this score, but neither do I wish to be understood as having considered such questions.

## The alteration or amendment—reenactment and publication limitation, art 4, § 25

Just as the word "object" is a protean word, so, too, are the words "alter" and "amend". A change in statutory law can be viewed solely in terms of its direct consequences or in terms of its indirect, or even remote, consequences as well.

A change in the procedure for maintaining an action may alter the enforceability of rights established under other laws. Yet no one would suggest

[26] See People v Gadway, 61 Mich 285, 290 (1886); Westgate v Adrian Twp, 161 Mich 333, 335 (1910); People v Stanley, 344 Mich 530, 541 (1956); Wardle v Cummings, 86 Mich 395, 401 (1891).

In the last cited case, Mr. Justice McGRATH said for the Court (p 401):

"The fact that the title of the amended act set forth the specific purposes of the amendment did not affect the title to the act which it amended, inasmuch as the object of the amendment was within the scope of the title of the original act."

[27] See Maki v East Tawas, supra; Loomis v Rogers, supra; People v Carey, 382 Mich 285, 295–297 (1969).

that the UCC, for example, should be reenacted and again published when the Legislature makes a change in court procedure even though the procedural change might effectively deprive some persons of rights conferred by the UCC.

Chapter 8 of the Compiled Laws, concerning statutes, states rules of construction applicable to all statutes.[28] These statutory rules of construction, much like the no-fault act, redefine words used in other statutes without reenacting and publishing the statutes that are affected.

The following are examples of such definitions:

—annual meeting, MCLA 8.3d; MSA 2.212(4);

—grantor and grantee, MCLA 8.3e; MSA 2.212(5);

—inhabitant, MCLA 8.3f; MSA 2.212(6);

—insane person, MCLA 8.3g; MSA 2.212(7);

—issue, MCLA 8.3h; MSA 2.212(8);

—land, real estate and real property, MCLA 8.3i; MSA 2.212(9);

—month and year, MCLA 8.3j; MSA 2.212(10);

—person, MCLA 8.3*l* MSA 2.212(12);

—general election, MCLA 8.3s; MSA 2.212(19);

—firearm, MCLA 8.3t; MSA 2.212(20);

—population, MCLA 8.3v; MSA 2.212(22);

—computation of period of days, MCLA 8.6; MSA 2.217;

—registered mail, including certified mail, MCLA 8.11; MSA 2.220. This common-sense method of legislating definitions would be impossible if the Legislature was obliged to reenact and publish the acts affected.

The claim that the no-fault act fails to reenact and publish at length sections of earlier acts has

[28] *See* MCLA 8.3, 8.3a–8.3w, 8.4–8.7, 8.11; MSA 2.212, 2.212(1)–2.212(23), 2.213–2.218, 2.220.

centered around the civil liability act,[29] the wrongful death act,[30] the Motor Vehicle Accident Claims Act[31] and, incidentally, the provision in the Revised Judicature Act establishing a six-year period of limitations for bringing most contract actions.[32]

It is entirely true that the no-fault act makes no reference to these earlier acts. A person reading the no-fault act or the earlier acts would not necessarily become aware of the changes in the operative effect of the earlier acts brought about by the no-fault act. But this is not an absolute consideration. As the opinions of Justices M. S. COLEMAN and WILLIAMS demonstrate, our cases hold that a later act can constitutionally alter or amend or repeal by "implication" the effect of an earlier act without express reference to the earlier act, reenactment and publication at length.

In *People v Mahaney,* 13 Mich 481, 497 (1865), Mr. Justice COOLEY said that "an act complete in itself is not within the mischief designed to be remedied" by the reenactment and publication provision. Thus, although the act considered in *Mahaney* made no express reference to other acts and, by its terms, repealed inconsistent acts without identifying the acts affected, the constitutional requirement was not violated. Mr. Justice WILLIAMS would limit the exception for an act complete in itself to acts which meet a three-part test which he derives from subsequent cases as explained in his opinion.

Arguably, no act is an "island entire of itself". Every act draws on some other act or acts—perhaps an appropriation act or the Revised Judica-

[29] MCLA 257.401; MSA 9.2101.
[30] MCLA 600.2921, 600.2922; MSA 27A.2921, 27A.2922.
[31] MCLA 257.1101; MSA 9.2801.
[32] MCLA 600.5807; MSA 27A.5807.

ture Act or an act establishing a unit of government. "Completeness", then, is necessarily a flexible concept. The *Mahaney* and *Mok*[33] cases (which have been fully discussed in the opinions of Justices M. S. Coleman and Williams) mark two outer boundaries. Between the two, further lines can be drawn.

The principal change in former law wrought by the no-fault act is the modification of the common-law liability for negligence in driving an automobile. In consequence, there is a change in the recoveries allowable under the civil liability act and the wrongful death act.

The civil liability act established the vicarious liability of an automobile owner for negligence of a driver who uses the automobile with the owner's permission. The wrongful death act makes possible maintenance of an action even though an injured person dies. However, even though that vicarious liability and actions for wrongful death and survival of actions was unknown to the common law, the substantive law applied under the civil liability act and the wrongful death act is the common law of negligence—unmodified, merely extended in operative effect—by the civil liability act and the wrongful death act.[34]

True, the damages recoverable under the civil liability and wrongful death acts have been significantly changed by the no-fault act and, in that sense, the substantive rights established by those acts have likewise been changed. But the no-fault act does not change the features of these earlier

[33] *Mok v Detroit Building & Savings Association, No 4,* 30 Mich 511 (1875).

[34] *See* in regard to an action for wrongful death or survival, 2 Harper and James, Law of Torts, § 24.3, p 1289: "In general the basis of liability so far as defendant's conduct is concerned is the same as that for personal injuries".

acts which make them unique, the vicarious liability in one case and the actionability of wrongful death and survival of actions in the other. What is changed is the extent of the liability for which the owner is vicariously liable and which survives death, and that change is made in all cases without regard to whether the negligent driver or the owner of the automobile is sued, or a person who is injured lives or dies. The thrust of the change, then, is not in the earlier acts *qua* acts but upon the common-law right to sue for all damages "proximately caused" by the negligence of the tortfeasor.

Before the no-fault act was enacted, a reader of the civil liability or wrongful death acts would not have expected there to find and would not have found an elucidation of the law of negligence, at length or in a nutshell. This constitutional limitation restricts legislative alteration or amendment of earlier statutory law, not common law. A legislative modification of the common law can properly be enacted without reenactment and publication at length of provisions of earlier acts which assimilate or implement, but do not purport to state, the common law.

Further, I do not share the concern that a person, aware of the no-fault act, who reads the civil liability or wrongful death acts may experience difficulty understanding the effect of the no-fault act on these earlier acts—once he understands the no-fault act. In any event, adding words like, "except as tort liability has been modified by 1972 PA 294 (the no-fault act)" to the civil liability and the wrongful death acts would not clear up any uncertainty in meaning.

The Motor Vehicle Accident Claims Act authorizes registration of an uninsured motor vehicle

upon payment of $45.[35] However, under the no-fault act it will no longer be lawful to operate an uninsured motor vehicle if it is required to be registered in this state or if operated in this state for an aggregate of more than 30 days in any calendar year.[36] Presumably, the intent of the Legislature is that the liability of the Motor Vehicle Accident Claims Fund to pay damages caused by uninsured motor vehicles will be taken over by the assigned claims facility provided for in the no-fault act as amended.[37] The precise interplay of the earlier accident claims and the new no-fault acts is not stated. The public, Bench and Bar must fathom this for themselves.

Arguably, the failure of the Legislature to address itself to the interplay of the two acts constitutes a violation of the spirit of the reenactment and publication requirement. However, we are not here confronted with a "legislative labyrinth"[38] of the kind dealt with in the *Mok* case where the Court described the involved provisions of the acts before it as "fragments which are incapable of having effect or of being understood until fitted in to other acts after by construction or otherwise places have been made for them".[39] The constructional problems here appear to be manageable.

Moreover, the constructional problems here concern, in the main, which source of recovery will be liable for accidents caused by uninsured vehicles on and after October 1, 1973. Until the matter is clarified by proper authority, a cautious person, injured by an uninsured vehicle on or after that

---

[35] MCLA 257.1103; MSA 9.2803.

[36] MCLA 500.3101, 500.3102; MSA 24.13101, 24.13102.

[37] *See* 1972 PA 345 amending §§ 3171–3176 of the no-fault act. MCLA 500.3171–500.3176; MSA 24.13171–24.13176.

[38] *Alan v Wayne County,* 388 Mich 210, 271 (1972).

[39] *Mok v Detroit Building & Savings Association, No 4, supra,* p 529.

date, can protect himself by claiming under both acts. The legislative failure to be more precise does not present intractable problems to the injured citizen.

It should be added that to the extent, if at all, there has been a violation of the reenactment and publication requirement because of the failure to spell out the precise interplay between the earlier accident claims act and the no-fault act, the remedy need not be a declaration of unconstitutionality. Another remedy would be simply to declare that the liability of the accident claims fund continues.

The no-fault act requires, with certain exceptions, commencement of an action to recover no-fault insurance benefits within one year after the accident.[40] Opponents of the no-fault act contend that this time limitation is an unconstitutional attempt to change, without reenactment and publication, the six-year period of limitation established in the Revised Judicature Act for bringing most contract actions.[41] In a similar situation, this Court held in *Evans Products Co v State Board of Escheats,* 307 Mich 506, 535, 537 (1943), that a statute relating to escheats did not violate this constitutional limitation by providing that, "No statute of limitations of this State shall be a defense to any proceeding or action to escheat". This Court said:

"The Michigan escheat law is an act referring to a special subject and is complete in itself. It removes escheat proceedings from the operation and effect of the general statute of limitations and thereby merely modifies the effect of the statute of limitations only to that extent."

---

[40] MCLA 500.3142, 500.3145; MSA 24.13142, 24.13145.

[41] See fn 32.

Noteworthy in this connection is the provision in the statutorily-mandated standard fire insurance policy which provides that an action on the policy must be commenced within 12 months after inception of the loss.[42] There have been countless cases where this exception to the general statute of limitations has been enforced.

In summary, whether the no-fault act is or is not an act "complete in itself", it comprehensively covers a new approach to compensating victims of negligent automobile driving. Generally, when a new act changes earlier acts by so-called implication, the new act fails to identify or reenact or publish at length affected sections of earlier acts. Thus, even though a new act does not spell out the changes in earlier acts so that a reader of the new act or of an affected act will be readily aware of the changes, it does not follow that the constitutional limitation requiring reenactment and publication at length has been violated. In this case, the changes in earlier law are primarily changes in the common law. The constructional problems, fitting the new and the old together, do not seem to present any unusual difficulty.

Like so many other questions which reach us, the meaning of this constitutional limitation as applied to a particular case becomes, in the last analysis, a matter of judgment, not subject to resolution by a talisman. As Cooley put it, the question becomes whether the challenged act is "within the mischief designed to be remedied"?[43]

Despite concessions which have been made by the Attorney General, I am satisfied that, on balance, having in mind both the purpose and the letter of the reenactment and publication require-

---

[42] See fn 24.

[43] See *Mahaney, supra,* text between fns 32 and 33.

ment, the no-fault act falls on the constitutional side of the obscure line between *Mahaney* and *Mok.* See *Checker Mutual Automobile Insurance Co v Wayne Circuit Judge,* 330 Mich 553, 557–558 (1951).[44]

Since the Senate has solicited this advisory opinion, I take the liberty of suggesting to the Legislature that it follow the counsel of the Attorney General and of Mr. Justice WILLIAMS and, between now and October 1, 1973, adopt appropriate amendments to overcome the possible problems under art 4, § 25 to which they have adverted.

T. G. KAVANAGH, J., concurred with LEVIN, J.

WILLIAMS, J.

## I —INTRODUCTION

The passage of the no-fault act[1] through the Michigan Legislature generated much controversy and publicity as to whether no-fault under any circumstances was a constitutional concept. This controversy and publicity spilled over into two full days of argument by numerous vigorous and distinguished counsel before this Court.

However, the three questions officially asked us pursuant to Const 1963, art 3, § 8 are limited in

---

[44] The pertinent headnote to the official report of this opinion reads:
"Statute adding section to insurance code, which permitted use of insurance policy of defendant's insurer to be used in lieu of an appeal or stay bond did not violate provision of Constitution requiring amendment of a section by re-enactment and publication at length merely because it impliedly amended a section of the judicature act relating to stay bonds on appeal (CL 1948, §§ 522.33a, 622.23)."

[1] The "no-fault" act was enacted by 1972 PA 294 which added a chapter to the Insurance Code, 1956 PA 218; MCLA 500.100 *et·seq.;* MSA 24.1100 *et seq.* The "no-fault" act is now chapter 31 of the Insurance Code, MCLA 500.3101 *et seq.;* MSA 24.13101 *et seq.* The no-fault act has in turn been amended since its passage by 1972 PA 345, amending §§ 3171 through 3176.

scope and impact.[2] This Court is in no way asked
its opinion about the constitutional validity or
invalidity of the no-fault *concept*. We assume that
the no-fault *concept* is perfectly constitutional and
nothing in this opinion expresses any thought to
the contrary.[3]

As a matter of fact Questions 1 and 2[4] do not
even go to the substance of the no-fault act. They
only relate to whether the no-fault act was en-
acted by proper and constitutional procedure.
Question 3 raises the issue whether certain words
used are sufficiently precise to allow constitution-
ally operational interpretation.[5]

This opinion concurs in finding the matters
raised by Questions 1 and 3 constitutional. We find
no problem with Question 3. We concur with the
result in Question 1 because of the presumption of
constitutionality and the possibility of severability
which dictate that our doubt on this issue should

---

[2] In the briefs and oral arguments upon the preliminary hearing in
this case, many interesting questions were suggested by lawyers
participating on an amicus basis regarding particular details of the
statute and other legal theories that might be applied to other
sections of the statute. None of these questions are within the scope of
the advisory opinions requested and consequently may not properly
be considered by the Court. We raise this point only to underscore the
fact that no litigant is precluded from raising those or other questions
or for that matter the questions in this opinion in adversary cases
and no inference one way or the other about the merits of questions
can be drawn from our failure to consider them because, lacking
jurisdiction, we simply did not consider them one way or the other at
all.

[3] Quite obviously the Legislature has power under Const 1963, art 3,
§ 7 to originate or abolish statutory forms of tort liability as well as
the power, concurrent with the inherent and express constitutional
power of the Court to change common-law tort liability.

[4] Question #1, text above, p 462, asks whether *anything* in any
part of Act 294 violates the title requirements of Const 1963, art 4,
§ 24. Question #2 asks only whether the "amendment by reference"
accomplished by § 3135 (and that section alone) violates the reenact-
ment requirements of Const 1963, art 4, § 25.

[5] Question 3, text above, p 462, limits itself to phrases found in
§ 3135(1) of Act 294.

be resolved for the present in favor of constitutionality.

Question 1 deals with Const 1963, art 4, § 24 which requires an act's title to have only one object and that everything in the act must be "expressed" in the title. The no-fault act title and text raise issues such as the title purporting to require security only for losses arising out of "certain" specified accidents,[6] whereas the text requires security not only for such "certain" accidents but security for accidents generally.[7]

However, in the brief time available to this Court for properly considering and preparing an advisory opinion to be useful in this matter and the problem for both counsel and this Court in analyzing comprehensively the broad spectrum of possible issues raised by Question 1, it is difficult to challenge with confidence the general presumption of constitutionality protecting an act of the Legislature, particularly where the constitutional provision involved admits of the remedy of severability. For these reasons, I concur with the result of constitutionality reached by my colleagues.

---

[6] That portion of the title concerning mandatory insurance or "security" reads:

"[T]o require security for losses arising out of *certain* accidents; * * * ." (Emphasis added.)

[7] Section 3101; MCLA 500.3101; MSA 24.13101 requires that owners and registrants not only keep in effect the so-called "no-fault" insurance ("personal protection insurance" and "property protection insurance") but the section also requires that the owner or registrant keep in effect "residual liability insurance". Under § 3131 of the act; MCLA 500.3131; MSA 24.13131, we find that "residual liability insurance" must cover bodily injury and property damage occurring anywhere in the United States, its territories and possessions or in Canada. We further find that "In this state this insurance shall afford coverage for automobile liability *retained* by Section 3135". Thus, Act 294 requires that a person "shall maintain security" not only for no-fault insurance but he must maintain security for the situations excluded by no-fault. As regards the requirement of mandatory security, therefor, the object of Act 294 is to require security for losses arising out of all accidents, whereas the title only speaks of requiring security for losses arising out of "certain accidents".

Moving briefly to Question 3, since we will deal with Question 2 more particularly later, this opinion finds no difficulty in concurring in constitutionality under the particular question raised.

Finally, although this opinion finds in dealing with Question 2 that the constitutional procedures required by art 4, § 25 were not complied with, since this is an advisory opinion, this is not a decision declaring the no-fault act unconstitutional. The no-fault act is not invalidated and continues to stand. Furthermore, this opinion may be only the advice of a portion of this Court in an individual capacity, although the exact consequences of an advisory opinion under the Constitution of 1963 have not yet been decided by this Court.[8]

The Legislature consequently is perfectly free to take such action as it conceives to be advisable to promote the operability of the no-fault act, if it so desires. As a matter of fact, at least one bill, SB 284, has already been introduced for the purpose of amending the civil liability act "with respect to 'no-fault' insurance effect on tort liability." 52 MSBJ 261, April, 1973.

In short, this opinion cannot, and does not, consider or attack the concept that the Legislature in legislating on no-fault can pass perfectly valid and constitutional legislation. The opinion concurs in the constitutionality of the issues raised by Questions 1 and 3 and advises that the Legislature failed to follow procedural requirements of Const 1963, art 4, § 25 but that this can be remedied, if the Legislature so wishes, without having to begin from scratch and enact the no-fault act again.

---

[8] Prior expressions of this Court referred to in Justice Coleman's opinion were written in regard to other state constitutions which contain the words "opinions of the justices". Our constitution refers not to the several opinions of the justices, but to the "opinion of the Court".

The following parts of this opinion will all deal with Question 2.

## II —QUESTION 2: BASIC ISSUE

The real question here is not whether the concept of "no-fault" is constitutionally viable but whether the Legislature followed the constitutional procedures art 4, § 25 requires in the legislative process.

The question asked under Const 1963, art 3, § 8 follows:

"DOES THE 'MODIFICATION OR AMENDMENT BY REFERENCE OF ANY OTHER MICHIGAN STATUTORY PROVISIONS WITH RESPECT TO THE SUBSTANTIVE LAW OF TORTS BY REASON OF SECTION 3135' VIOLATE THE FOLLOWING MICHIGAN CONSTITUTIONAL LIMITATION: 'NO LAW SHALL BE REVISED, ALTERED OR AMENDED BY REFERENCE TO ITS TITLE ONLY. THE SECTION OR SECTIONS OF THE ACT ALTERED OR AMENDED SHALL BE REENACTED AND PUBLISHED AT LENGTH.' CONST 1963, ART 4, SEC 25."

When art 4, § 25 is applied to § 3135 of the no-fault act no amount of legal talking around the subject can hide four plain facts:

1. The no-fault act plainly is meant to "modify" existing law—in fact its very title says so.

2. When the no-fault act uses the term "to modify" and what it does pursuant thereto is plainly what art 4, § 25 is talking about when it refers to "revised, altered or amended".

3. Art 4, § 25 plainly says the Legislature cannot "modify", or, to use the constitutional words, "revise, alter or amend" existing law without reenactment and republication.

4. Since the Legislature did not reenact and republish these sections or acts the no-fault act purports to amend and since the no-fault act purported to "revise, alter or amend" existing law, the no-fault act plainly was not enacted properly pursuant to the procedures required by art 4, § 25.

Let us examine this more in detail.

## III —NO-FAULT "MODIFIES" EXISTING LAW

The title of the no-fault act in stating its purpose includes: "[T]o *MODIFY* tort liability arising out of certain accidents * * * ." (Emphasis added.)

The no-fault act, § 3135(2) follows up the "modification" notice in the title as follows:

"Notwithstanding any other provision of law, tort liability arising from the ownership, maintenance or use within this state of a motor vehicle * * * is abolished except as to: * * * ."

That § 3135(2) does in fact "modify" existing law is clear by reference to the civil liability act for example. The civil liability act, § 401 pertinently provides:

"The owner of a motor vehicle shall be liable for any injury occasioned by the negligent operation of such motor vehicle whether such negligence consists of a violation of the provisions of the statutes of the state or in the failure to observe * * * the common law * * * ." 1949 PA 300; MCLA 257.401; MSA 9.2101.

No legal argument or exegesis is necessary to prove that § 3135(2) and § 401 are mutually contradictory and that therefore § 3135(2) as the later passed "modifies" § 401.[9]

---

[9] Section 3135 purports equally to modify the wrongful death act by superseding it except where death is intentionally caused (§ 3135[2] [a]), where noneconomic losses are involved in a death

In short, § 3135 purports "to modify" existing law.

## IV —NO-FAULT "MODIFY" EQUALS ART 4, § 25 "REVISED, ALTERED, OR AMENDED"

As already noted the no-fault act purports to, and does, "modify" existing law.

What does "MODIFY" mean? The leading dictionaries, legal and non-legal, use "modify" interchangeably with "alter" and "amend":

Black's Law Dictionary—

*MODIFY—"To alter * * ** [citing cases]. See *Modification."*

*ALTER—"To make a change in; to modify * * ** [citing cases]. See Alteration, Change."

*AMEND—"To 'amend' implies that the modification* made in the subject improves it, which is not necessarily the case with an *alteration.* [citing case.]" (Emphasis added.) (This language appears under "alter.")

Webster's New International Dictionary (2d ed unabridged)—

*MODIFY—"4. To change somewhat the form or qualities of; to alter somewhat * * * ."*

*ALTER—"1. To change in one or more respects, but not entirely; to make (a thing) different without changing it into something else; to vary; to modify * * * ."*

*AMEND—"4. To change or modify* in any way for the better * * * 5. [T]o change or alter in any way * * * ."

Random House Dictionary of the English Language (1966 ed unabridged)—

---

(§ 3135[2] [b] and § 3135[1]) and where a survivor's damages exceed those allowed under the no-fault act (§ 3135[2] [c]).

*MODIFY—"1. to change somewhat the form or qualities of; alter partially * * * ."*

*ALTER—"1. to make different in some particular, as size, style, course, or the like; modify * * * ."*

*AMEND—"1. to alter, modify * * * ."*

It cannot be gainsaid that the no-fault act's "to modify" is the same as art 4, § 25's "revised, altered or amended".

## V —"MODIFICATION" OF CIVIL LIABILITY ACT IS REVISION OF STATUTORY AS WELL AS COMMON LAW

There is no doubt that § 3135 purports to modify, alter or amend both common law and statutory law. Because of the limitation of time we will consider only the effect on the so-called "owners liability" statute. Vicarious owners liability, *qua owner,* is not derived from common law and is purely statutory in Michigan,[10] governed by the so-called "owners liability act", MCLA 257.401; MSA 9.2101 The owners liability statute has been said, in fact, to be in *derogation* of the common law, not merely in affirmance of it, *Wieczorek v Merskin,* 308 Mich 145, 148 (1944).

Section 3135(2) does not purport to "modify" only common-law tort liability because it refers not merely to tort liability arising from *"maintenance or use",* but also refers to that tort liability arising purely from *"ownership".* Since there is no common-law liability arising purely from ownership, it can only be the owners liability in the civil liability act that is being referred to. MCLA

[10] The liability of an owner for "negligent entrustment" *is* common law derived but is not based *merely* on his status as owner but rather upon his *conduct* in the entrusting, *Perin v Peuler,* 373 Mich 531 (1964).

257.401 is the only "provision of law" giving rise to tort liability for mere "ownership".[11]

All parties arguing here on this question agree that the *only* purpose of § 3135 is to modify or amend the owners liability statute, among others.[12]

## VI —NO-FAULT NOT AN ACT COMPLETE IN ITSELF EXCEPTION TO ART 4, § 25

It has been argued that the no-fault act falls within the "act complete in itself" exception to the art 4, § 25 requirement of reenactment and repub-

---

[11] It may not be said that the owners liability statute is conditioned exclusively upon only *common-law* liability of the operator. The violation of statutes constitutes negligence per se so that the only question for the jury is whether there was causation, *not* whether there was negligence, *Vaas v Schrotenboer,* 329 Mich 642, 650 (1951). The common-law duty of due care is *independent* of statutory duties and the rule of negligence per se, *Holmes v Merson,* 285 Mich 136, 140 (1938); *Dempsey v Miles,* 342 Mich 185, 192–193 (1955). Any number of fact situations easily come to mind where a person might be found not "negligent" by a jury under common-law rules even though his violation of a statute constitutes negligence per se which *removes* from the jury the question of negligence, leaving only that of causal relation.

[12] The Attorney General's briefs are the primary briefs pursuant to this Court's order of February 2, 1973, directing the Attorney General to file briefs on the affirmative and negative sides of the questions. The only other briefs addressing Question 2 are the amicus briefs of the Michigan Trial Lawyers Association and that part of the combined League General Insurance—American Insurance Association—UAW—CAP amicus briefs prepared by Honigman, Miller, Schwartz and Cohn representing the American Insurance Association (AIA).

The brief of the Attorney General *Supporting* Constitutionality states on pp 19–20 as follows:

"*These proponents of the constitutionality of 1972 PA 294 cannot argue that § 3135 of said act does not violate art 4, § 25 of the 1963 Constitution.* To do so, and be sustained, would only result in further examination of said act which could result in a determination that other sections of the act violate the constitutional limitation."

The Attorney General's Brief *Opposing* Constitutionality obviously concurs that § 3135 violates art 4, § 25. The AIA brief, p 14, readily concedes that § 3135 modifies many other statutes and that "the most obvious statute affected is the Civil Liability Act" but endeavors to bring the no-fault act within "the act complete in itself exception" to art 4, § 25.

lication. Reference is made to two quotations from Justice COOLEY in *People v Mahaney,* 13 Mich 481 (1865):

1. "The act before us does not assume in terms, to revise, alter or amend any prior act, or section of an act, but by various transfers of duties it has an amendatory effect by implication, and by its last section it repeals all inconsistent acts. We are unable to see how this conflicts with the provision referred to." (13 Mich 481, 496).

2. "But an act complete in itself is not within the mischief.designed to be remedied by this provision [art 4, § 25] * * * ." (13 Mich 481, 497)

There is no doubt about there being "an act complete in itself" rule. Equally there should be no misunderstanding that the no-fault act is "an act complete in itself". There are three tests of what constitutes "an act complete in itself" and the no-fault act does not meet any of these tests.

The *first test* is "[t]he act * * * supersedes and repeals all other acts in relation thereto." *Attorney General ex rel Fuller v Parsell,* 100 Mich 170, 173 (1894).[13] To the same effect: *In re Roberts,* 51

---

[13] This case is relied upon and quoted by the AIA brief (p 23) as to apply the "complete in itself" doctrine to Act 294. *Attorney General ex rel Fuller v Parsell,* 100 Mich 170 (1894) involved a "revision and consolidation" of laws governing penal institutions. The "repealer" clause said that *"parts* of acts" contravening the provision of the new act "are repealed". On this it was argued that parts of earlier law not in conflict were not repealed. The Court held that *because* the act was *"complete,"* all prior law on the subject was repealed. Some of the language of the Court in *Parsell* gives meaning to the quote from *Parsell* in the AIA brief, p 23:

"It would seem in accordance with reason to hold that, when the Legislature revises and consolidates certain acts, and *covers the entire subject,* the act, as revised and consolidated, supersedes and repeals all other acts in relation thereto. * * * The act in question contains 66 sections, and its provisions cover the *entire management and control* of and *[sic]* discipline in the penal institutions named. *There is not a single provision of the former laws which is requisite or necessary for the management and control of these institutions.*

*"But it is argued that the language in the repealing clause, that 'all*

Mich 548, 554–555 (1883);[14] *Ripley v Evans,* 87 Mich 217, 231–232 (1891);[15] *Grinnell Brothers v Moy,* 230 Mich 26, 30 (1925).[16] See also *Porter v Edwards,* 114 Mich 640, 643 (1897).

To begin with the title of the no-fault act is "to *modify"* tort liability rather than "supersede and repeal". Furthermore there is no general repeal-

acts and parts of acts contravening any of the provisions of this act are hereby repealed', *indicates an intention to retain those provisions of the old law which may be held not to conflict with the new. We are of the contrary opinion.* It would be unreasonable to hold that the Legislature, while covering the entire subject, and declaring its intention to be to revise and consolidate all the laws upon the subject, intended to leave in force any provisions of the former laws which the courts might determine did not contravene the provisions of the new act." 100 Mich 170, 173–174. (Emphasis added.)

[14] *In re Roberts,* 51 Mich 548 (1883). This case holds that the 1883 substitute charter of the City of Detroit *repeals* all provisions of the former act, even if they are completely consistent. The act complete in itself "covers the whole subject." Some of the opinions in *Roberts* were quoted in the concurring opinion in the *Parsell* case as follows:

" 'It [the 1883 charter] does not purport to be a partial or supplementary, but to be the only charter. There can be no doubt of this purpose, and there can be no doubt that * * * *it cannot be admissible to select out of older charters matters omitted in this as still in force.* If this could be done on one subject no one can see where the process would stop. There are many omitted provisions which no one would consider repugnant. We must assume that things omitted are designedly omitted.' "

And further on the meaning of "an act complete in itself" Justice MONTGOMERY pointed out that:

*"The rule is well settled that, even though two acts are not repugnant, yet if the later covers the whole subject of the first, and contains provisions showing that it was a substitute, it will operate as a repeal.* See *Shannon v People,* 5 Mich 85 [1858] * * * ." *Parsell,* 100 Mich 170, 178–179, quoting in part from *Roberts,* 51 Mich 548, 554–555. (Emphasis added.)

[15] *Ripley v Evans,* 87 Mich 217 (1891). The "complete" act here was an act governing enforcement of stockholders' personal liability for certain corporate debts. The act contained a "repealer" like that in *Parsell, supra,* repealing all acts or "parts of acts". The Court said the prior act giving another form of remedy was not merely "amended", but was *repealed* outright by the later act. *See* p 231, last paragraph and following.

[16] *Grinnell Brothers v Moy,* 230 Mich 26 (1925) also involved a later act with an "all acts or parts of acts" repealer clause. The later act provided a different period of time on a procedural matter. The case makes clear that the later act *repealed* the earlier provision, not that it merely "amended" it. *See* p 30, last paragraph and following.

er.[17]

It is quite clear that the no-fault act does not purport to "supersede" or "repeal" all acts related to it. In fact, § 3135 attempts to preserve certain parts of prior acts or actions. For example, § 3135(1) and § 3135(2)(a) refer necessarily to the wrongful death and civil liability acts in case of "[d]amages for noneconomic loss" where "the injured person has suffered death".

The no-fault act does not meet the "supersede and repeal" test.

The *second test* is "[t]here is not a single provision of the former laws which is requisite or necessary for the management and control of" motor vehicle liability. *Parsell, supra,* 100 Mich 170, 173.

We have already discussed this under the first test above. Section 3135 specifically indicates that no-fault act actions and remedies are not all inclusive but other law including statutes must be relied on.

The no-fault act does not meet the second test of not having to rely on "a single provision of the former law".

The *third test* is formulated by Justice Cooley himself in *Mahaney,* where he said:

"An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect * * * and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision * * * ." *Mahaney, supra,* 13 Mich 481, 497.

---

[17] Not only is there no general repealer but the no-fault act, 1972 PA 294 title was amended by striking at the end "and to repeal certain acts" suggesting that any repealer might not be within the coverage of the title.

The no-fault act certainly inserts certain words, to wit, the civil liability act's § 401's first sentence is modified in some such way as "the right of any person EXCEPT THOSE COVERED BY NO FAULT INSURANCE EXCEPT AS EXCEPTED BY SECTION § 3135 to prosecute a civil action * * * ." (Added part in capitals.)

This necessity of interpolation falls afoul of another rule generated by art 4, § 25 and articulated by Justice COOLEY in *Mok v The Detroit Building & Savings Association No 4,* 30 Mich 511, 523 (1875):

"[These] changes and modifications * * * [were] not made by the re-enactment of the sections changed or modified, but only by indicating the extent of the changes, leaving the parties concerned to fit the new act to the old as best they may."

See also *Alan v Wayne County,* 388 Mich 210, 272 (1972).

The no-fault act does not meet the third test, because it purports as far as tort liability is concerned "only to insert certain words, or to substitute one phrase for another".

In short, the logic of the matter is contained in the No. 1 reference to *Mahaney* above. The point is that "an act complete in itself * * * does not assume in terms to revise, alter or amend * * * but * * * repeals all inconsistent acts." Dramatically we can see the difference between a modification or alteration which leaves in doubt what of the old law is good, what bad and a complete repeal which wipes out the old law altogether. Obviously the no-fault act is dealing in modification or alteration and not a complete repeal. Equally obviously no-fault is not "an act complete in itself".

## VII —IS NO-FAULT A PERMISSIBLE "AMENDMENT BY IMPLICATION"?

As the Attorney General noted in one of his briefs the words "amendment by implication" can be very confusing. Actually, the words "amendment by implication" in no way constitute a precise semantical test but must be viewed in the context in which they are used. These contexts are various and must be viewed in relation to their several fact situations.

Justice Cooley articulated the most important such fact category in *Mahaney*, namely, "acts complete in themselves". We have just examined this and discovered the no-fault act does not meet the "act complete in itself" fact tests.

A second fact category of so-called "amendments by implication" is that group where there is no alteration of anything that existed but only the addition of a not inconsistent but harmonious provision. *Swartwout v The Michigan Air Line R Co,* 24 Mich 389, 399 (1872); *People v Wands,* 23 Mich 385, 388–389 (1871). We have already considered how the no-fault act modifies and alters the civil liability act. Hence it cannot be considered as only making a harmonious addition.

A third permissible fact category called amendment by implication involves repeal by implication and incorporation by reference. *Fornia v Wayne Circuit Judge,* 140 Mich 631 (1905) is an example of this. Here an 1893 act set up a jury commission and prescribed its duties, and a 1903 act provided that the county clerk draw the juries and repealed all inconsistent acts. The *Fornia* Court said:

"By the act of 1903 the clerk is designated as the

officer to perform this duty. The act in *no other way changed* the duties of the jury commissioners. The clerk is substituted in the place of the commissioners. * * * and *all the provisions of the law as to the details of the proceeding must be followed strictly.* This act does not assume, in terms, to revise, alter, or amend any prior act or section of an act, but, by various transfers of duties, has an amendatory effect by implication * * * ." 140 Mich 631, 634. (Emphasis added.)

The no-fault act does not purport to repeal any part of an act outright and incorporate by reference the rest of the prior act without change.

The no-fault act rather falls in that category where the incorporation by reference is *with change* rather than without change. The leading case illustrating the negative application of this rule is Justice COOLEY's, *Mok v The Detroit Building & Savings Association No 4,* 30 Mich 511 (1875). An 1869 act provided for the incorporation of building and savings associations under an 1855 act authorizing the formation of corporations for building and leasing housing. The 1855 act in turn provided such corporations could be formed under an 1853 act providing for the formation of mining and manufacturing corporations. The *Mok* Court said:

"But while the act of 1869 referred parties in this circuitous manner to that of 1853 for the requirements in organization, it undertook at the same time to dispense with some things required by that act, and to make some changes." *Mok,* 521.

* * *

" * * * [these] changes and modifications * * * [were] not made by the re-enactment of the sections changed or modified, *but only by indicating the extent of the changes, leaving the parties concerned to fit the new*

*act to the old as best they may." Mok,* 523, quoted in
*Alan,* 272. (Emphasis added.)[18]

More recently this Court had a similar case in
*Alan v Wayne County,* 388 Mich 210, 268–288
(1972). There the building authority act (1948 PA
[1st Ex Sess] 31) sought to incorporate part of the
Revenue Bond Act (1933 PA 94) and at the same
time amend it to permit tax bonds. We held the
part attempting the change to tax bonds without
reenactment and publication offensive to art 4,
§ 25. Of like effect, *Clay v Pennoyer Creek Im-
provement Co,* 34 Mich 204 (1876);[19] dissenting
opinion in *People v Stimer,* 248 Mich 272 (1929)
adopted in *Alan, supra,* 277; *In re Petition of
Auditor General,* 275 Mich 462 (1936).

A quotation from *In re Petition of the Auditor
General, supra,* is instructive both as to how the
no-fault act offends art 4, § 25, *viz.* by not repeal-
ing *in toto* but altering in part, and how the
Legislature should have proceeded:

"What was done is the very thing that the Constitu-
tion aimed to prevent. The so-called repeal of section 66
(section 3458) actually is an amendment of this section
for a large portion of it remains unaffected, and pro-
vides for the publication in the instant case. This sec-

---

[18] *Mok* also says:
"[T]he constitutional provision [art 4, § 25] * * * *forbids the enact-
ment of fragments which are incapable of having effect or of being
understood until fitted in to other acts after by construction or
otherwise places have been made for them * * * ." Mok,* 529, quoted
in *Alan,* 272, quoted in AIA brief, p 20. (Emphasis added.)

[19] *Clay v Pennoyer Creek Improvement Co,* 34 Mich 204, 208–210
(1876) is like *Mok* and the purported amending was also held invalid.
(Discussed in *Alan,* pp 273–274.) The *Clay* Court also saw art 4, § 25
as a mandate for all possible clarity and precision in statutes so that
where prior acts are referred to:
"[I]t will not be necessary that parties should either omit from or
add important words or provisions to the sections referred to in order
to render them applicable." Clay,* 209, quoted in *Alan,* 274. (Emphasis
added.)

tion, as amended, should have been reenacted and published at length in the amended form so as to conform with the constitutional mandate, hereinbefore quoted." 275 Mich 462, 468.

The no-fault act falls into the *Mok* category, because as previously indicated it leaves it to the public to try to figure out where the no-fault act fits in with the civil liability and wrongful death acts by inserting and removing words here and there. The no-fault act therefore is not a permissible repeal by implication and incorporation by reference.

## VIII —CAN ART 4, § 25 BE AVOIDED BY MAKING NO REFERENCE TO LAW AMENDED?

It has been suggested that the reenactment and publication requirement of art 4, § 25 can successfully be avoided by making no reference to the law which would be amended.

Did total omission of any reference to the law to be amended in the no-fault act successfully avoid the requirements of art 4, § 25?

The answer is no on two counts. "A" assuming there were no reference to the law to be amended, if a minimal reference such as to "title only" is insufficient, no reference at all is even less sufficient. "B" finding that there is some reference in the no-fault act to the law to be amended, such reference is inadequate.

### A —*Assuming No Reference*

Can art 4, § 25 be avoided by making no reference at all to the law to be amended?

To ask this question should, in common sense,

answer it. The purpose of art 4, § 25 is to give notice and certainty. Obviously, if reference to the title only is not enough for notice and certainty, giving no reference at all is *a fortiori* not enough.

That the purpose of art 4, § 25 is to give notice and certainty is readily confirmed by reading and considering the whole section together. Const 1963, art 4, § 25 reads:

"No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length."

Immediately clear on reading § 25 is that amendment "by reference to its title only" is constitutionally not good enough *AND* "the section or sections of the act altered or amended" must be "reenacted and published at length."

Publication provides *notice.*

Reenactment of the section altered or amended at length provides *certainty.*

A moment's reflection on "re-enactment" emphasizes the purpose of requiring the words of the amendatory act and the words of the amended act to be fitted together in a new text. This eliminates any guessing as to what word goes where, as we have seen exists in comparing § 3135 of the no-fault act and § 401 of the civil liability act.

Two quotations from Justice Cooley illustrate and confirm these two purposes.

Notice is particularly stressed in *People v Mahaney,* 13 Mich 481, 497 (1865):

"The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison,

failed to become apprised of the changes made in the laws."

Certainty is stressed in *Mok v Detroit Building & Savings Association No 4,* 30 Mich 511, 516 (1875):

"Alterations made in the statutes by mere reference, and amendments by the striking out or insertion of words, without reproducing the statute in its amended form, were well calculated to deceive and mislead, not only the legislature as to the effect of the law proposed, but also the people as to the law they were to obey, * * * ."

Logical construction of art 4, § 25 seems to invalidate the idea that this section can be avoided by omitting any reference to the law to be amended. But let us consider—can't technical reliance on the words "by reference to its title only" avoid the requirements of reenactment and publication.

Justice COOLEY himself spoke quite plainly on the subject of trying to avoid a constitutional purpose by a technical construction. In *People ex rel Bay City v State Treasurer,* 23 Mich 499, 506 (1871) he said:

"[I]t cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments * * * to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient."

More recently this Court again spoke pertinently in *Lockwood v Commissioner of Revenue,* 357 Mich 517, 556–557 (1959):

"The literal construction of the words, without regard

to their obvious purpose of protection, is to make the
constitutional safeguard no more than a shabby hoax, *a
barrier of words, easily destroyed by other words.* This
canon of constitutional construction we reject. A consti-
tutional limitation must be construed to effectuate, not
to abolish, the protection sought by it to be afforded."

Furthermore this Court has not only looked to
the real purpose of the constitution but investi-
gated not only the apparent purpose of possibly
conflicting statutes but any, even unintentional,
side effect. Our Brother T. G. KAVANAGH said in
*Gallegos v Glaser Crandell Co,* 388 Mich 654, 672
(1972):

"A court is not confined to a sterile examination of
the statute itself, but must look to its effect. Such effect
alone may dictate a finding that [a constitutional provi-
sion] has been denied. * * * If the effect is direct we
have little trouble in determining discrimination. If the
direct effect is not constitutionally offensive however,
we must look for any indirect effect. *An indirect effect
is no more legitimate than a direct effect, and we must
assay the effect apart from the purpose. 'The existence
of a permissible purpose cannot sustain an action that
has an impermissible effect.'"* (Footnotes omitted, em-
phasis added.)

In short this Court enforces the purposes the
people intended in their constitution. Here art 4,
§ 25 intends that where there is amendment of
prior law "reference to title only" is not enough,
there must be reenactment and publication at
length so that legislators and the public alike can
read for themselves the language of the law as
amended without having to pick a word from one
act and fill in with a word from another. Omission
of all reference to the act to be amended and
failure to reenact and publish violates art 4, § 25.

## B — *No-Fault Makes Oblique Reference to Act to be Amended*

As the furthest extreme from "reference to its title only", we have examined whether complete omission of reference to the act to be amended could obviate the art 4, § 25 requirements of reenactment and publication. We found it did not.

It appears, however, that the no-fault act is not as far away from the wording of art 4, § 25 as to make no reference to the act to be amended. Section 3135 makes specific reference to abolition of tort liability arising purely from "ownership". There is only one statute, one "provision of law" governing liability purely from "ownership". There is no common-law liability arising *purely* from ownership (see above) so § 3135(2) can only be "referring" to the owners liability statute. There *IS* an amendment "by reference" to the owners liability statute.

Measuring this interpretation of the no-fault act situation against the purposes of notice and clarity found in "A", we must find again that no-fault violates art 4, § 25.

*In re Petition of Auditor General,* 275 Mich 462 (1936) is instructive as to how this Court has handled a case where there was not a complete omission of reference and neither a reference to title only nor reenactment. In *Auditor General* the amendatory act made no reference to the title of the act to be amended but did purport to repeal the prior act. This Court said:

"Appellants contend that in addition to other constitutional defects, Act No. 243 is in direct violation of the Constitution, 1908, art. 5, § 21, which provides that:

" 'No law shall be revised, altered or amended, by reference to its title only; but the act revised and the

section or sections of the act altered or amended shall be reenacted and published at length.'

"The last sentence of Act No. 243, Pub. Acts 1935, states that provisions of Act No. 206, §§ 64, 65, 66, Pub. Acts 1893 (1 Comp. Laws 1929, §§ 3456, 3457, 3458), requiring publication of the list of lands delinquent for taxes are repealed. What was done is the very thing that the Constitution aimed to prevent. The so-called repeal of section 66 (section 3458) actually is an amendment of this section for a large portion of it remains unaffected, and provides for the publication in the instant case. This section, as amended, should have been reenacted and published at length in the amended form so as to conform with the constitutional mandate, hereinbefore quoted." (275 Mich 462, 467–468 [1936]).

To sum up,

1—The clear intention of the people in art 4, § 25 is to require the Legislature to "amend" by reenactment and publication in order to provide notice and clarity.

2—If a subsequent act is "complete in itself" and conflicts with a prior act, it can repeal but not amend it, although it is sometimes called an "amendment by implication".

3—If a subsequent act repeals a portion of a prior act by implication and incorporates all the rest of the prior act without any change or amendment, this too is a permissible so-called "amendment by implication" although in reality it is a repeal in part.

4—If a subsequent act adds to a prior act but is harmonious and not inconsistent with the prior act, it is not a "revision, alteration or amendment" within the meaning of art 4, § 25.

5—Omission of reference to the title of an act to be amended in the amendatory act does not avoid the necessity of reenactment and publication required under art 4, § 25.

6—Reference of some sort to the act to be amended and failure to reenact and publish violates art 4, § 25.

## IX —CONCLUSION

The no-fault act, as its very title indicates, "modifies" or "revises, alters or amends" prior law. It comes within no category such as "an act complete in itself" repealer or partial repealer and incorporation by reference without change or harmonious addition. Furthermore, this Court has not recognized an actual amendment which simply omits language of reference as avoiding the consequences of art 4, § 25. As a consequence, it is our opinion that the no-fault act violates art 4, § 25 and Question 2 must be answered "Yes, the no-fault act by reason of § 3135 does violate Const 1963, art 4, § 25."

T. M. KAVANAGH, C. J., concurred with WILLIAMS, J.

I concur specially in my Brother LEVIN's observations on advisory opinions in part I.

T. M. KAVANAGH, C. J., concurred with WILLIAMS, J.